## TAYLOR et al. v. CONTINENTAL SUPPLY CO.*

(Circuit Court of Appeals, Eighth Circuit. November 22, 1926.)

No. 7139.

1. Bills and notes ⬅534—Provision in note for attorney's fees is for indemnity.

A provision in a note for attorney's fees is for indemnity, and not for a penalty, nor for the purpose of enriching the party suing.

2. Bills and notes ⬅534.

The amount agreed on in a note as attorney's fee is presumed to be a reasonable fee.

3. Bills and notes ⬅534—Provision for attorney's fee covers services in defending against counterclaim and negotiating for settlement.

Where notes provided for attorney's fee in case of suit, a reasonable fee covers services rendered in defending against a counterclaim and in negotiations for settlement.

*Rehearing denied February 23, 1927.

**4. Judgment ⬅812(2)—That attorney's fees were not included in judgment in rem on chattel mortgage held not to preclude recovery in action for deficiency.**

Where notes providing for attorney's fees and secured by chattel mortgage were set up by plaintiff by intervention in a suit by others to enforce liens against the mortgaged property, in which service was by publication, and in a court of a state where by statute such provisions for attorney's fees were void, the fact that plaintiff did not claim attorney's fees therein, and that they were not included in its judgment in rem did not preclude it, on the ground that it had split its cause of action, from claiming them in a subsequent action against the makers to recover a deficiency.

**5. Judgment ⬅592—Splitting cause of action must be voluntary to bar subsequent action.**

The rule against splitting causes of action applies only where the splitting is voluntary, where the law has placed no impediment in the way of plaintiffs' obtaining, in the action he has brought, the full measure of relief to which he is entitled.

**6. Bills and notes ⬅92(3).**

Extension of time for payment of an account is sufficient consideration for a provision for attorney's fees in notes taken.

**7. Bills and notes ⬅534—Provision for attorney's fees in notes held binding on indorsers.**

Where notes of a corporation were indorsed by three men, who were substantially the corporation, and contained in the same paragraph a provision for attorney's fees, a waiver of notice of nonpayment, protest, etc., the provision for attorney's fees held binding on the indorsers.

**8. Trial ⬅260(3)—Instruction refused as to conclusiveness of expert testimony held covered by charge given.**

In an action on notes providing for attorney's fees, refusal of an instruction expressly stating that the testimony of experts as to the value of services rendered by plaintiff's attorneys did not preclude the jury from exercising their own judgment of error, was without prejudice, where the jury was instructed generally that they were the sole judges of the weight to be given to the testimony of any witness, and might disregard it entirely.

**9. Judgment ⬅812(2)—Judgment in rem on chattel mortgage held not bar to subsequent action on secured notes.**

A judgment in rem in a suit to enforce a chattel mortgage securing notes to which the makers of the notes were not parties and could not be served in the state, which judgment bound only the property, was not a merger of the notes, and does not bar a subsequent action thereon against the makers to recover the uncollected part of the debt.

**10. Principal and surety ⬅115(1)—Relinquishment of security by creditor discharges surety only to extent he is injured thereby.**

A relinquishment of security by the creditor does not discharge a surety entirely, but only to the extent to which he has been injured thereby.

**11. Appeal and error ⬅1068(5)—Trial ⬅260(9)—Refusal of requested instructions as to credit to indorsers on account of proceeds of mortgaged property held not prejudicial in view of instructions given and the verdict rendered.**

Refusal of requested instructions as to credit to which indorsers of notes secured by chattel mortgage were entitled on account of sale of mortgaged materials held not prejudicial error, in view of instructions given and the verdict rendered.

**12. Bills and notes ⬅516.**

Verdict in action on notes, in which defendants claimed a credit, and counterclaimed for services, held supported by the evidence.

In Error to the District Court of the United States for the District of Colorado; John Foster Symes, Judge.

Action at law by the Continental Supply Company against R. G. Taylor and others. Judgment for plaintiff, and defendants bring error. Affirmed.

Warwick M. Downing, of Denver, Colo. (Ralph Hartzell and Richard E. Downing, both of Denver, Colo., on the brief), for plaintiffs in error.

Robert E. More, of Denver, Colo. (Tyson S. Dines, Peter H. Holme, and Harold D. Roberts, all of Denver, Colo., on the brief), for defendant in error.

Before KENYON, Circuit Judge, and SCOTT and JOHN B. SANBORN, District Judges.

KENYON, Circuit Judge. The Continental Supply Company (defendant in error) was plaintiff in the trial court, and for convenience will be so designated here. In November, 1920, it sold to the Plateau Oil Corporation (herein designated the Plateau Company) certain oil well supplies. Plaintiffs in error, Taylor, Staley, and Frantz, were defendants in the trial court, and we shall so designate them here. They were officers, directors, and stockholders of said Plateau Company, which was preparing to drill an oil well in Kansas, known as the Hell Creek well. Defendants executed an agreement with plaintiff guaranteeing payments for material sold to the Plateau Company to the extent of $50,000. The Plateau Company purchased of plaintiff materials to the extent of $48,126.99. September 12, 1921, to cover the indebtedness, notes were executed by the Plateau Company, indorsed by defendants as follows: One for $3,126.99, due in 30 days; one for $15,000, due in 60 days; one for $15,000, due in 4 months; and one for $15,000, due in 6 months. After that

time further merchandise was sold to the Plateau Company by plaintiff, amounting to $2,534.29. In February, 1922, the Plateau Company gave plaintiff by way of collateral security a chattel mortgage on the material that plaintiff had sold to it. Thereafter certain liens were filed by materialmen in Kansas, where the property in question had been used.

Action was brought to enforce certain of said liens, and plaintiff intervened in the case, set up its chattel mortgage and the notes now in suit, and secured judgment as against the property. A meeting was held at the home of the defendant Taylor, at which the liens were discussed, and an agreement was entered into for defendants to take care of the liens on the property, for plaintiff to take the property covered by the chattel mortgage, and for a sale to be made thereof to the Marine Company, of which defendant Taylor was vice president and general manager. The property to be sold to the Marine Company was to be used by them in Wyoming. It is a matter of sharp controversy as to just what this agreement was. In any event, the property was sold to the Marine Company, and, after deducting certain necessary expenses covering the pulling of the casing, etc., the account, or notes of the Plateau Company, was credited with the sum of $17,698.90. Defendants under their theory of the case asked for an additional credit of $11,210.59, or with interest $12,802.49, which would make the credit for the salvaged material $28,909.49. Defendants' counterclaim asserted their right to recover for services rendered in securing certain accounts or contracts for the plaintiff, viz. what is known as the Western Pipe Line account, referred to in the testimony as "the Max Ball contract," in the sum of $242,213, the Marine Oil Company account in the sum of $251,235, and what was known as the Haskell account in the amount of several hundred thousand dollars, and that the value of such services in connection with the salvage of materials sold to the Plateau Oil Corporation was sufficient to equal the indebtedness to plaintiff. Much evidence was introduced in the case. The jury returned a verdict for plaintiff for $29,560.58.

Some 28 assignments of error are filed. The questions raised thereby can be grouped under a few heads, viz.: (a) Allowance of attorneys' fees; (b) effect of foreclosure proceedings in Kansas; (c) exclusion of the details of certain conversations between defendant Taylor and Max Ball; (d) refusal of instructions tendered by defendants on the question of their claim for commission; (e) refusal of instructions as to credit to be allowed defendants on the sales of the property in Kansas covered by the chattel mortgage; (f) compromise verdict. We consider them in their order.

I. Defendants make many contentions against the right to recover attorneys' fees. Each of the notes in suit contained this provision:

"Presentment for payment, notice of nonpayment, protest, and notice of protest are each hereby expressly waived, and in case payment shall not be made at maturity, and suit is brought hereon, it is agreed that 15 per cent. of the amount due will be paid in addition as an attorney's fee, and may be recovered as part thereof."

Mr. Horace N. Hawkins and Gov. Gunter as experts testified in the case in answer to a hypothetical question that $5,000 would be a reasonable attorney's fee. Mr. Holme, one of the attorneys for plaintiff, also testified, and set forth explicitly the services that had been performed by counsel for plaintiff. It appears that the fee claimed included services in connection with the resistance to defendant's counterclaim, and services in connection with proposed settlements of the matter after suit had been commenced.

[1, 2] It is without question that, in a suit upon a note which provides for attorneys' fees, such attorneys' fees are for indemnity, and not for a penalty, or for the purpose of enriching the party suing. Mechanics'-American Nat. Bank v. Coleman (C. C. A.) 204 F. 24; Florence Oil & Ref. Co. v. Hiawatha Gas, etc., Co., 55 Colo. 382, 135 P. 454; Jones v. National Bank, 74 Colo. 140, 219 P. 780. The amount in a note agreed on as attorney's fee is presumed to be a reasonable attorney's fee, and the burden is on defendant, when suit is brought on a note providing for attorneys' fees, to show that the amount fixed in the note is not such. 8 C. J. p. 1103, § 1438. Here there is ample testimony that the sum of $5,000 would be a reasonable fee, and there is no evidence to the contrary.

[3] We think the provision of the notes providing for attorneys' fees covered the cost of legal services to which plaintiff should be put in connection with the collection of its claim by court proceedings. Of course, there is some force in the position advanced by counsel for defendants that, if the counterclaim were brought as a separate action, then there could be no recovery of attorneys' fees for defending against the same. That, however, is not the situation here. To collect the notes it was necessary to bring suit and to defend

against the counterclaim. It was the agreement of the Plateau Company and the defendants, in giving the respective notes in suit, that if suit be brought attorneys' fees should be allowed, and that the attorney's fee should be 15 per cent. of the amount due. If it is not true that attorneys' fees can be collected in defense of a counterclaim, where it is sought to offset the amount due on a note when suit is brought thereon, then the provision for attorneys' fees would be of little force or effect, and easily circumvented. Nor do we see any reason why, where suit is brought upon notes providing for attorneys' fees and prior to the actual trial of the case there are negotiations for settlement, that a court must segregate the time of counsel employed in trying to effect a settlement from the time employed in the trial.

[4] Defendants also contend that, inasmuch as plaintiff brought an action in Kansas on these same notes and failed to there claim attorneys' fees, they cannot do so now; that the obligation to pay attorneys' fees arose but once, and that there is no obligation to pay them in successive actions. No one would dispute the latter proposition. It seems that an action was brought in Kansas by one Wolfe against the Plateau Company, seeking to enforce and foreclose a lien upon the equipment there, as well as the recovery of a money judgment. Plaintiff was named also as a defendant. It filed answer and cross-petition, praying foreclosure of its chattel mortgage, and asked judgment on the identical four promissory notes sued on in this case, and, after Wolfe had dismissed his action, took judgment against the Plateau Company upon the notes (not including any attorneys' fees) in the sum of $52,338.08. The judgment was not based on personal service, but service by publication. Defendants contend that by failure to ask for attorneys' fees in the Kansas suit the same were waived, relying upon the familiar rule of law that a party cannot split a single cause of action, recovering upon one part in one court, and another part at another time in another court, and rely somewhat upon Byers v. Investment Co., 10 Colo. App. 74, 50 P. 368, and Taub v. McClelland Co., 10 Colo. App. 190, 51 P. 168. Of course, the law is well settled that a single cause of action cannot be split up and divided, so as to be made the subject of various and different actions. 1 C. J. p. 1106, § 276; 34 C. J. p. 828, §§ 1239, 1240; 15 R. C. L. p. 965, § 440; Watkins v. American Nat. Bank of Denver (C. C. A.) 134 F. 36.

A statute of Kansas (section 6475, General Statutes of 1915) provides as follows:

*"Contract or Stipulation for Payment of Attorneys' Fees in Note, Bill of Exchange, Bond or Mortgage shall be Null and Void; application to mortgages existing in March, 1876. Sec. 13.* That hereafter it shall be unlawful for any person or persons, company, corporation or bank, to contract for the payment of attorneys' fees in any note, bill of exchange, bond or mortgage; and any such contract or stipulation for the payment of attorneys' fees shall be null and void; and that hereafter no court in this state shall render any judgment, order or decree by which any attorneys' fees shall be allowed or charged to the maker of any promissory note, bill of exchange, bond, mortgage, or other evidence of indebtedness by way of fees, expenses, costs or otherwise: Provided, that in all existing mortgages wherein no amount is stipulated as attorneys' fees, not more than eight per cent. on sums of two hundred and fifty dollars or under, and not more than five per cent. on all sums over two hundred and fifty dollars, shall be allowed by any court as attorneys' fees: And provided further, that this act shall not apply to existing mortgages wherein any sum has been stipulated as attorneys' fees. (L. 1876, Ch. 77, Sec. 1; March 1.)"

[5] In Taub v. McClelland Co., supra, the last sentence of the syllabus is as follows: "But this rule [that a cause of action shall not be split] applies only where the plaintiff is under no legal restraint as to the method he shall pursue in the assertion of his rights." The court did say in that opinion that a party was not at liberty to split a single cause of action, so as to recover upon a portion at one time and upon the residue at another. But the court held that the rule was not applicable to the facts of that case, because the action of the trial court in the replevin action had prevented plaintiff from obtaining a judgment for the full amount, and said: "But we apprehend that this rule is applicable only where the plaintiff is under no legal restraint as to the method he shall pursue in the assertion of his rights, where he has entire liberty in the management and conduct of his suit, and where the law has placed no impediment in the way of his obtaining, in the action he has brought, the full measure of relief to which he is entitled. * * *" And the court pointed out that the company had not voluntarily split its claim and brought suit for remainder after recovery upon a part; that there was a partial verdict

which covered only the property; that the subsequent proceeding affected the money, and was in consequence of procedure adopted by the court.

Plaintiff here in its Kansas action could not recover attorneys' fees because of the provisions of the Kansas statute. The Kansas proceedings, it must be borne in mind, were in rem. All that the plaintiff could do with that judgment was to satisfy its claim out of the property in the possession of the court. If that property was not sufficient to pay the judgment, as it clearly appears from the record it was not, there could have been no deficiency judgment. Plaintiff had no opportunity in the Kansas court to assert its claim for attorneys' fees. There was no voluntary splitting of its cause of action.

[6] It is also contended by defendants that there was no consideration for the attorney's fee provision in the notes, that the guaranty did not cover the attorneys' fees, and that the notes were given in pursuance of the terms of the guaranty. The trial court, when the question was before it, stated: "The evidence so far shows that the notes were taken and some extension of time was given on these accounts. In addition to that the promissory notes recite on their face that a value received has been given. There has been no evidence given to rebut that." We think the trial court's conclusion was correct. Notes were given for different periods of time, and it is perfectly apparent that extension of credit was given to defendants, which was sufficient consideration for the attorney's fee provision of the notes.

[7] It is further claimed that the provision relating to attorneys' fees does not apply to indorsers. The Plateau Company seemed to consist of the three defendants, and in taking the notes plaintiff evidently did not rely upon the Plateau Company as a corporate entity, but required indorsement of the notes by the defendants. The provisions hereinbefore set out as to payment, notice of nonpayment, protest, etc., are in the same paragraph and in fact in the same sentence as the provision for attorneys' fees, and it is apparent that the attorney's fee provision was intended to be binding upon the indorsers. No one else had any interest in the provisions as to protest, notice of protest, etc. Counsel in their brief state: "The claim of liability for attorney's fees as against defendants as indorsers is of the same general nature as the liability of a guarantor."

In Byers v. Investment Co., 10 Colo. App. 74, 50 P. 368, the face of the notes contained a guaranty "payment * * * at maturity * * * waiving demand, notice of nonpayment and protest." The attorney's fee provision was in a different paragraph, but upon the face of the note. It was held by the Court of Appeals of Colorado that the guaranty included a reasonable attorney's fee, and that it was proper that the judgment cover the same.

The rule as to liability of indorsers for attorneys' fees is not settled. There is much diversity of court opinion thereon. 8 C. J. § 1432, cites the cases on both sides of the question. Here, however, the question is ruled by the facts of the particular case. It is apparent from all the circumstances, viz. that defendants were substantially the Plateau Company, and especially the language of the agreement included in the notes, that it was intended defendants should be liable for attorneys' fees if suit was brought thereon. That was the contract. We see no reason why it is not binding.

[8] Defendants asked an instruction, which was refused by the court, as follows:

"You are instructed that the expert testimony given by attorneys as to the value of the plaintiff's attorneys' fees does not preclude you from exercising your own knowledge upon the value of such services. It is your duty to weigh the evidence and testimony of the attorneys as to the value of plaintiff's attorney's services, if any, by reference to their nature, the time occupied in their performance, and other attending circumstances, and you may apply to it all your own experience and knowledge, if any, of the character of such services."

Expert testimony had been given in this case as to the value of attorneys' fees. Defendants were entitled to an instruction that the expert testimony did not preclude them from exercising their own judgment as to the value of the services rendered by the attorneys. Head v. Hargrave, 105 U. S. 45, 26 L. Ed. 1028.

We turn to the instructions given, to see if this question is covered thereby. The court instructed the jury:

"Taking up, first, this question of attorneys' fees, the court instructs you it is perfectly legal and lawful to provide in a promissory note for the payment of attorneys' fees in the manner found in this note. Such a provision is regarded as a protection and indemnity to the holder of the note for any expense he may be put to by the other party in collecting anything actually due him, and the plaintiff can recover only what it has actually paid to its attorneys or obligated itself

to pay, so far as the same is shown by the evidence, and such payment or obligation you must find from the actual evidence to be actual, bona fide, and reasonable, considering the service that the attorneys in this case rendered. Therefore the amount allowed for attorneys' fees should not exceed the amount that plaintiff has actually paid or obligated itself to pay, and in this case in any event should not exceed $5,000, which is the amount they say they agreed to pay. That agreement is not necessarily binding upon the defendants, but it is simply evidence of what reasonable attorneys' fees in this case are proper, because what the parties agreed to is pretty good evidence of what is reasonable. That fact and the other evidence introduced here, that of the two experts, Mr. Horace Hawkins and Gov. Gunter, is the evidence upon which you will decide what a reasonable attorneys' fee is, and add that to your verdict. * * *

"The court further instructs you, gentlemen, in this case as I have before, that you are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony. It is for you to say whether you shall give full weight, or what weight, or will disregard the evidence of any particular witness."

The jury was here told that the agreement as to attorneys' fees was not binding upon defendants as to amounts, but that it was simply evidence of what reasonable attorneys' fees would be. The court did refer to the evidence of Mr. Hawkins and Gov. Gunter as the evidence upon which the jury would decide what a reasonable attorney's fee would be, but later the court instructed the jury that they were the sole judges of the credibility of the witnesses, and that they could disregard the evidence of any particular witness. Of course, as counsel for defendants say in their brief, they do not deny the truth of the evidence of Mr. Hawkins and Gov. Gunter; but nevertheless, under the instruction of the court, the jury could have disregarded their evidence entirely. While the instruction requested was a proper one, and we think should have been given, we do not believe, in view of the fact that the court did cover the question to some extent in his instructions, and the jury were told they could disregard the evidence of any particular witness, that there was any prejudice resulting in the failure to give this instruction. The substance thereof was covered by the instructions of the court. There was ample evidence in the record to sustain a finding of attorneys' fees in the sum of $5,000. It is impossible to know from the verdict of the jury whether any attorneys' fees were allowed. We have considered the question under the assumption they were.

[9] II. It is defendants' theory that the notes sued on in this case were merged in the Kansas judgment; that under the terms of the guaranty defendants were called upon to pay notes given as evidenced of indebtedness and all judgments obtained thereon, and that the notes are superseded by the judgment. The rule as stated in 15 R. C. L. p. 792, § 247, is relied on: "The most important effect of the merger of a cause of action in a judgment is that, after the merger, the judgment is the evidence of the debt, and a proceeding in reference thereto should be founded on the judgment, for, after a cause of action has been merged in a judgment, it cannot be made the basis of a subsequent action or judgment."

Defendants contend that, notwithstanding the fact there was no personal service upon the Plateau Company in the Kansas case, nevertheless the judgment is conclusive, and plaintiff cannot impeach its own judgment nor deny its efficacy, and cases are cited on this proposition. Defendants were not made parties in the Kansas litigation. The Plateau Company was a nonresident of Kansas.

The situation seems to be this: Plaintiff here, by cross-petition in a suit in Kansas in which it was a defendant, asked judgment upon these notes against the Plateau Company, and a foreclosure of its chattel mortgage upon the property of said company. The judgment was in rem. The property was sold under private arrangement, and, while there is controversy over the amount of credit to be allowed defendants, there is no controversy over the fact that the proceeds were to be applied on the claim or on the judgment. Plaintiff cannot bring suit upon this Kansas judgment, because it is merely a judgment in rem, and defendants now contend it cannot bring action for the collection of the balance due upon the notes, because they have been merged in a judgment upon which action cannot be brought. The reasoning is not persuasive. The procedure is common of bringing in various states actions in rem by attachments to cover one claim, and applying the proceeds upon the indebtedness where the judgment against the property is realized on. Certainly that does not foreclose a party from attempting to collect in other states against property there situated; and in bringing a subsequent action upon the claim the fact that a portion of the claim had been realized by proceed-

ings in rem in a particular state would not sustain a plea of res adjudicata as to the entire claim when suit for the balance was brought elsewhere. The cases cited on this proposition by defendants are all where the proceedings were in personam. When the proceeding is in rem, there certainly is no merger as to the uncollected part of the indebtedness.

In Cooper v. Reynolds, 10 Wall. 308, 318 (19 L. Ed. 931) the Supreme Court said: "But, if there is no appearance of the defendant, and no service of process on him, the case becomes, in its essential nature, a proceeding in rem, the only effect of which is to subject the property attached to the payment of the demand which the court may find to be due to the plaintiff. That such is the nature of this proceeding in this latter class of cases, is clearly evinced by two well-established propositions: First the judgment of the court, though in form a personal judgment against the defendant, has no effect beyond the property attached in that suit. No general execution can be issued for any balance unpaid after the attached property is exhausted. No suit can be maintained on such a judgment in the same court or in any other, nor can it be used as evidence in any other proceeding not affecting the attached property, nor could the costs in that proceeding be collected of defendant out of any other property than that attached in the suit.

In Smith v. Curtiss, 38 Mich. 393, the trial court had held that the note pleaded as a set-off was merged in a judgment rendered in an action commenced by attachment where there was no personal service upon defendant and no appearance by him, and the property attached levied upon under an execution issued in pursuance of the judgment. The Supreme Court said: "In this the court erred. There being no personal service in the case commenced by attachment and no appearance, and no part of the judgment rendered therein having been satisfied under the attachment proceedings, such judgment would not bar a personal action upon the note, or an assignment thereof to a third party."

In Blumberg v. Birch, 99 Cal. 416, 34 P. 102, 37 Am. St. Rep. 67, there was a suit upon a promissory note. Plaintiff had previously foreclosed a mortgage securing the note, which had satisfied the indebtedness in part. Defendant was served by publication only. The lower court held the foreclosure proceeding merged the original obligation. The Supreme Court of California held this was er-

ror and that suit could be brought for the unpaid balance. See, also, National Bank v. Peabody, 55 Vt. 492, 45 Am. Rep. 632.

In the matter now before us jurisdiction in the Kansas case was as to the property only and no judgment in personam could be rendered. Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565. The effect of that proceeding was merely the appropriation of the property to a partial payment of the debt. Plaintiff is not attempting to impeach the Kansas judgment. It is pursuing its legitimate remedies to collect the balance of indebtedness by a proper action. We are satisfied the Kansas foreclosure offers no bar to the present action.

III. Another alleged error urged is the action of the court in not permitting witness, Taylor, to testify as to a certain conversation with one Max Ball. When Mr. Taylor, one of the defendants, was upon the stand, and after there had been considerable testimony as to his efforts to have the Max Ball Pipe Line contract given to plaintiff, the following occurred:

"Q. I do not want to ask you, then, Mr. Taylor, as to your motive in the matter. But you have testified that you talked to Max Ball on a number of occasions. What did you say to Max Ball in the effort to get him to give this contract to the Continental?

"Mr. Prosser: We object as being hearsay testimony. It does not appear Mr. Bell or any representative of the plaintiff was present. He is testifying to something—a conversation that ensued between him and Mr. Ball.

"The Court: Objection sustained.

"Mr. Downing: I think it is permissible to show what he did. What he did is really what he said.

"Mr. Prosser: It could not bind us in any way.

"Mr. Downing: Maybe not, but we are put upon the proof of services which we claim were of large value.

"The Court: The objection will be sustained.

"Mr. Downing: Save an exception."

It was an important question in this case whether defendants had rendered service to plaintiff in procuring certain contracts or accounts. One of the accounts which defendants claim they secured was the Max Ball Pipe Line account, amounting to $242,213.56. It is defendants' claim that through a process of persuasion or argument they secured this account, that they could only show through evidence of conversations the influ-

ence which was exerted to secure the same, and that such was the purpose of the questions asked Mr. Taylor as to his conversations with Mr. Ball, who represented the Max Ball Pipe Line Company. There was a great deal of testimony in the record concerning efforts of defendants to secure accounts for the plaintiff, especially the Max Ball Pipe Line one. The testimony sought to be elicited was merely in the nature of cumulative evidence, and while we think there would have been no error in its admission, we are likewise of the opinion, in view of all the evidence in the case on the subject, there could be no prejudicial error in its exclusion.

IV. A number of assignments of error relate to the refusal of the court to instruct the jury in respect to defendants' claims for credit for returned materials. These assignments present, we think, the most serious questions in this case. Plaintiff conceded a credit of $17,698.90 for salvaged materials. Defendants claimed a credit of $28,909.49. When the Plateau Company abandoned its Hell Creek well on May 19, 1922, there were claims against the property for taxes on behalf of the state of Kansas, for indebtedness to G. L. Wolfe for $652.24, with interest, and one of the Pioneer Trust & Transfer Company for $2,275.60. These claims were liens against materials which had been sold by plaintiff to the Plateau Company, and on which plaintiff had a chattel mortgage. Instead of selling the property at sheriff's or mortgagee's sale, the evidence shows that a conference was held at defendant Taylor's house between all the defendants and Mr. Bell, representing plaintiff; that it was agreed the defendants should discharge the liens on the Hell Creek equipment and pull the casing; and that the equipment should be sold to the Marine Oil Company, with which Mr. Taylor was connected. The evidence is in conflict as to what the agreement entered into at Taylor's home in fact was, and that was a question of fact for the jury to determine.

Defendants contend that the agreement was to appraise the material at a maximum discount of 15 per cent. below cost; that the material should be appraised by Mr. Olney, representing defendants, and Mr. Bell, representing plaintiff, the exact discount, depending upon the condition of the materials, to be ascertained by the said Olney and Bell; and that the same should be sold at such appraisal to the Marine Oil Company, and the Plateau Company was to receive credit for such appraised price. Plaintiff claims that the appraisement was to be at the fair market valuation, without limitations. Defendants allege that they discharged the claims against the materials, and paid the expense of pulling the casing; that plaintiff took the materials, and did not have the same appraised or checked by Olney and Bell; that the reasonable discount from the cost was 10 per cent.; that, excluding the materials worn out or worthless, the cost price of the materials returned to the plaintiff was $35,269.57, and that, after deducting a 10 per cent. discount and the cost of pulling the casing, defendants were entitled to a credit of $28,-909.49; that after Mr. Taylor ceased to be manager of the Marine Oil Company, on December 2, 1922, the Olney appraisal was dispensed with, the material was shipped to Casper, Wyo., without any appraisal, and that then Mr. Max Ball, president of the Marine Oil Company, entered into an agreement with plaintiff for an appraisment of the material at Casper in a different manner than agreed upon by plaintiff and defendants; and that payment was made for the material by the Marine Oil Company on the basis of prices unanimously fixed by Mr. Bell, and Mr. Kline of the Continental Company, and Mr. Ferguson of the Marine Oil Company, defendants having no representation in the appraisment. As a result of this the Marine Oil Company paid $20,532.02 for the material. Deducting the proper credits for pulling the casing, etc., left a balance of $17,-698.90, which was credited on the accounts or notes. Evidence was introduced by defendants tending to show these matters.

[10] Defendants insist that the court should have given its requested instruction, directing a verdict in favor of all of the defendants upon the theory that defendants were sureties, and were discharged because the creditors had materially altered their obligation, and had not secured full value of the property covered by the chattel mortgage. There was no error in refusing to direct a verdict for the defendants. The principles of suretyship are well settled; also the equitable doctrine of variation of risk, namely, that a creditor may not interfere with his surety's right of subrogation. A relinquishment of security by the creditor does not discharge a surety entirely, but only to the extent to which he has been injured thereby. In Brown v. First Nat. Bank of Newton, Kan. (C. C. A.) 132 F. 450, this court said: "The wrongful surrender of collateral security by a creditor without the knowledge of sureties for the payment of the debt discharges them from liability therefor entirely or pro tanto,

according to the value of the security thus surrendered." Whether defendants were sureties or guarantors or indorsers, the defense that plaintiff had not secured all it should from the sale of the security under the chattel mortgage was only a pro tanto one. "A relinquishment, loss, or misapplication of security by the creditor does not discharge the surety entirely, but to the extent only to which he has been injured thereby." 32 Cyc. p. 225. See, also, American Bonding Co. of Baltimore v. Pueblo Inv. Co. (C. C. A.) 150 F. 17, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357.

We refer later to the question of Taylor's alleged consent to the change in the method of disposing of the security. We are satisfied that the court was correct in refusing to direct a verdict for defendants on the ground of material alteration of the obligation or relinquishment of security.

[11] Defendants requested the court to give to the jury the following instruction:

"You are instructed that, if you believe from the evidence that the plaintiff and the defendants entered into an agreement at Mr. Taylor's house during the month of August, 1922, by the terms of which the parties would sell, or cause to be sold, to the Marine Oil Company the materials at the Hell Creek well at an appraisal to be made in Gove county, Kan., by Messrs. Olney and Bell, and if you further believe that the Marine Oil Company agreed to make such purchase at such appraised price, and if you further believe from the evidence that thereafter the plaintiff, without the consent of the defendants, failed to carry out said agreement, but, on the contrary, without the consent of the defendants, sold to the Marine Oil Company, upon and under an agreement made between the Marine Oil Company and the plaintiff, made without the consent of the defendants, by the terms of which the said materials were to be purchased upon an appraisal to be made by unanimous vote of three appraisers one of whom was Mr. Ferguson, the field superintendent and nominee of the Marine Oil Company, and if you believe from the evidence that thereby the defendants were placed in a materially less favorable position to save themselves from loss, then you are instructed that the defendants' are entitled to a credit of $28,909.49, upon the amount due on said notes."

The court refused, and proper exception was taken. Defendants also requested the court to give another instruction covering defendants' contention as to the agreement made at Mr. Taylor's house, and the alleged nonperformance by the plaintiff thereof. The last paragraph, which the court refused to give, of that instruction, is as follows:

"If you believe from the evidence that the plaintiff and the defendant did make the contract so alleged, and that the defendant complied with the same, then, it is your duty to give the Plateau Oil Corporation credit for the agreed value of the materials so returned, notwithstanding that the plaintiff may have afterward sold to the Marine Oil Company the said materials at less than such agreed price, but without the consent of the defendants; and if you so believe from the evidence, it is your duty to allow the defendants the said credit of $28,909.49 in lieu of the credit of $17,698.90 allowed by plaintiff."

The court gave that part of the requested instruction stating what defendants claimed. Plaintiff urges that the court practically gave to the jury the instruction requested. The court, after setting forth fully the claim and theory of defendants as to the salvaged materials, said:

"It, therefore, is conceded, gentlemen, that the plaintiff has established its claim against the defendants for $2,534.29 upon the open account, with interest thereon from February 20, 1923. It is likewise conceded and undisputed that they have established their claim upon the four promissory notes, aggregating $48,128.99, all dated September 12, 1921, and all drawing interest at 8 per cent. That leaves for your determination these issues: First, whether the plaintiff is entitled to attorneys' fees, and, if so, in what sum; second, whether the defendants are entitled to this net credit of $28,909.49 claimed by them, or the $17,698.90 that is conceded by the plaintiff; and, third, whether the defendants are entitled to credit for the amount of services as testified to by them, and, if so, the amount thereof."

Was this sufficient? If an agreement was made between defendants and the plaintiff that a certain procedure should be followed in appraising and disposing of the property which was security in part for the indebtedness, and if without fault on the part of defendants such appraisement was not made, but was totally ignored by plaintiff and a new arrangement made between plaintiff and the Plateau Company, then defendants were entitled to what the material in the hands of the plaintiff would have brought according to the terms of the agreement. That does not involve a question of law, but merely one of square dealing and common honesty. It is claimed by plaintiff that Taylor agreed to the change in plan as to appraisement of the

property. Taylor denies this, raising a distinct question of fact. If Taylor consented to the change, he, of course, is not in position to claim any injury as to him resulting therefrom (28 C. J. p. 998, § 158), and if he was authorized to make such arrangement for Frantz and Staley they would be bound by what he did. This was a question of fact for the jury. Also whether defendants, by delay in carrying out their part of the agreement in failing to discharge the lien when they should, or to pull the casing without delay, and have the material shipped to the Marine Oil Company at the earliest possible moment, as plaintiff claims the agreement contemplated, breached the arrangement made at Taylor's house. It seems to be conceded that, if the agreement was as claimed by defendants and had been carried out, they would have been entitled to a credit of $28,909.49.

Defendants were entitled to have their theory submitted to the jury, with some directions from the court for guidance. The court did fully state the claims of defendants in the language of the requested instruction, and followed it by the statement heretofore set forth as to the issues before them for determination, which indicated, of course, that if the jury believed defendants' witnesses on the subject they should allow a credit of $28,909.49 as claimed. While we would have been better satisfied if the requested instructions under consideration had been given, we do not feel that the case should be reversed on this ground, in view of the instructions actually given by the court. The jury must have understood it was within their province to allow the credit claim of defendants in full. Our opinion, that the failure to more fully instruct on the question of salvage was not prejudicial, is confirmed somewhat by the argument presented in plaintiff in error's brief in the discussion of the alleged "compromise verdict." Counsel say on page 70 thereof: "But inasmuch as attorney's fees must have been allowed, there can be no reasonable question but that the verdict was reached by allowing us the full amount of credit claimed for salvage and one-half the commission on the Max Ball account." Counsel also in presenting their idea of how the verdict was reached give credit of $28,909.49 for salvage and say: "There is no other hypothesis upon which to explain the verdict." We are inclined to the conclusion that there was no such prejudice in refusing these two instructions, or either of them, as to warrant a reversal of the case.

V. Other assignments of error relate to the court's refusal to give certain requested instructions as to defendants' right to recover for services. The defendants do not complain as to the actual instructions given the jury, but insist the court should have given more instructions on the subject than it did. Defendants claim that Bell of plaintiff's company employed them to secure the Max Ball Pipe Line Company, Marine Oil Company, and Haskell accounts or contracts, and that through their efforts this business was secured. Witness Bell denied that he so employed defendants. The court instructed the jury rather fully with relation to these matters, reviewing somewhat the evidence, calling attention to the defendants' testimony, and Mr. Bell's denial thereof, and told the jury it was the law of the case, "that mere gratuitous efforts, or efforts which the defendants might make to get this business for the plaintiff out of friendship for the Continental, or in order to put them in their good graces or good standing, is not sufficient upon which to base a contract for services such as is claimed here. Before you can find that such an agreement was entered into and that the defendants are entitled to any commission, you must find that an agreement was in fact made, and that in pursuance to such an agreement the defendants in fact rendered the services contemplated thereby. In other words, it must be more than a mere friendly act between intimate business associates. On the other hand, such an agreement does not have to be proved by direct evidence that so and so said so and so, and so and so accepted that agreement, but may be proven by direct or indirect evidence, but it must appear plainly from all the facts and surrounding circumstances that Mr. Bell and the plaintiff, directly or indirectly, requested the services or took advantage of them when they were offered, with knowledge that the defendants would expect compensation for them."

One of the assignments refers to the requested instruction No. 12, which is as follows:

"Referring to the defense and counterclaim concerning services alleged by the defendants to have been rendered by them to the plaintiff, if it is not necessary to entitle the defendants to recover the reasonable value of such services that their efforts were the sole cause of getting the business in question for the plaintiff; but it is sufficient if you find from the evidence that the defendants did render the services they were requested by plaintiff to render and such services had an effect in a material degree in obtaining for plaintiff the business in question."

It may be noted that the court in its instructions, referring to the alleged services of defendants, said:

"It does not necessarily have to be the sole reason that resulted in the business, but it must be a very material moving cause of bringing about the giving of these three contracts or any one of the three to the Continental Supply Company in preference to other competitors who were in the field for this business."

This seems to fully cover the proposition of requested instructions No. 10 and No. 12. In 9 C. J. p. 554, § 58, the rule is laid down: "To entitle a broker to compensation, he must have been employed to negotiate the transaction in connection with which his services were rendered. In the absence of such employment, or in other words, where the broker acts as a mere volunteer, he is not entitled to compensation, although his services are the efficient cause of bringing the parties together and result in a sale or other contract between them."

The court in this case said to the jury that plaintiff would have to pay if "the plaintiff directly or indirectly requested the services or took advantage of them when they were offered, with knowledge that the defendant would expect compensation for them, or that, as reasonable men, the plaintiff should have believed that the defendants would not render the services unless they would be compensated therefor." That was a clear statement of the law. We are satisfied defendants have no real cause of complaint as to the instructions on this particular phase of the case.

[12] VI. Defendants devote a considerable part of their brief to a discussion of the proposition that the verdict was the result of a compromise on the part of the jury not based upon the evidence. A large number of authorities are cited and discussed, which need not we think be specially referred to. Of course, the verdict of a jury must be based upon competent evidence. Juries cannot render verdicts merely at their own whim or caprice as arbitrators, but they are bound by the evidence. A verdict which is opposed to undisputed evidence should be set aside by a court, but a court is not called upon to investigate with mathematical precision and nicety the method by which the jury has arrived at its verdict where the evidence is in dispute. Defendants assume too much, we think, when they say in their brief: "The undisputed evidence showed that we procured the Max Ball account, amounting to $242,-213.56, the Marine account of $344,485.00 and the Haskell account of at least $200,-000.00, a total of $786,800.56, and, further, the undisputed evidence showed that a reasonable commission was from 5 to 7½ per cent." Certainly the evidence is not undisputed as to any of these accounts. Mr. Bell, one of the officers of plaintiff company, testified he never requested defendants to get any business for his company, and that the defendants never did get any such business. Defendants testified that any alleged arrangements made for commissions were secret, and no claim therefor was made until the time this suit was brought. Defendants seem to assume that the jury must have returned a verdict for the commission on all three accounts, taking them together as one transaction, or else should have allowed no commission at all on any of them.

This position is not justified by the record. The jury might have allowed a commission on the Max Ball account and not on the other two. Mr. Taylor was vice president of the Marine Oil Company. If defendants' theory is correct, he contracted secretly for a profit to himself by securing a contract from his own company. It was within the jury's province, however improbable it may seem, to have allowed a commission thereon, and likewise on the Haskell account, although we think, if the question had been properly raised, that the question of a commission on the Haskell account should not have been submitted to the jury, the evidence showing such indefiniteness in the matter that recovery thereon could not be justified. The three accounts claimed to be secured by defendants for plaintiff amounted to some $786,800.56. A 5 per cent. commission thereon would have approximated $39,-340. Defendants' witnesses testified that reasonable commissions for such services would be from 5 to 7½ per cent. Plaintiff offered no evidence on the subject. We do not understand that the jury would be absolutely bound by this statement as to commissions.

Defendants assume to figure in their brief the method by which the jury arrived at their verdict of $29,560.58, and claim that they must have allowed for all or a part of their salvage claim and a part of their claims for services, and argue that they were entitled to all of the salvage claimed or none, and were entitled to a minimum of $30,000 for their services, or nothing. They state there can be no reasonable question but that the verdict was reached by allowing the full amount of credit claimed for salvage and one-half of the commission of the Max Ball

account. Many verdicts might have been returned under this evidence. Of course, no one can know from this record how the jury arrived at its verdict. If the jury allowed defendants full claim for salvage in the sum of $28,909.49, as claimed in their brief, and also allowed them some commission on the Max Ball Pipe Line contract, we think they have no just cause of complaint as to the verdict. It is a matter of grave doubt whether defendants were entitled to any commissions on any of the accounts. This was a difficult case for a jury. The fact questions were involved, and the voluminous record shows abundance of sharp contradictions. It is not humanly probable that so involved a case can be tried without some errors. Section 269 of the Judicial Code, as amended by Act Feb. 26, 1919 (Comp. St. § 1246), in part is as follows: "On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." It is applicable here. There were no errors affecting the substantial rights of the defendants. It is doubtful if the evidence would have justified a more favorable verdict so far as they were concerned. Under all of the circumstances, we feel that the verdict of the jury and the judgment of the court should not be disturbed.

Affirmed.