PELLERIN LAUNDRY MACHINERY SALES COMPANY, Inc., and Willis A. Pellerin, Appellants,

v.

J. M. REED, Naomi Reed, T. E. Reed, Ida Lee Reed, Rena Walters, Meadowood, Inc., and Craighead Laundry & Cleaners, Inc., Appellees.

No. 16865.

United States Court of Appeals Eighth Circuit.

March 7, 1962.

Rehearing Denied April 16, 1962.

G. Thomas Eisele, Little Rock, Ark., Wootton, Land & Matthews and Cooper Land, Hot Springs, Ark., for appellants.

Alston Jennings, Little Rock, Ark., for appellees.

Before VOGEL and RIDGE, Circuit Judges, and GRAVEN, Senior District Judge.

GRAVEN, Senior District Judge.

This is an appeal from a trial involving several complex factual issues arising out

of a series of financial transactions between appellants and the principal appellee. The transactions in question involved the sale and re-sale of laundry equipment. The corporate appellant is a Louisiana corporation engaged in the business of manufacturing and selling laundry equipment on a national scale. Its principal place of business is in Kenner, Louisiana. The individual appellant, Willis A. Pellerin, is the president of the corporation. The only appellee with any interest in this appeal, J. M. Reed, is a citizen of the State of Arkansas and has been engaged in the laundry business in the cities of Hot Springs and Benton, Arkansas. Jurisdiction is based upon diversity of citizenship and the requisite amount in controversy has been established. All transactions of the corporate appellant which are related to this controversy were handled by the individual appellant, Pellerin, acting in its behalf. For convenience of reference, these transactions will be referred to as if they were Pellerin's individual transactions.

Pellerin brought the action below alleging that Reed was indebted to him by reason of various transactions carried on between the parties over a period of some eight years. Reed, by way of counterclaim, prayed for a complete accounting between the parties and, in connection therewith, that he be awarded any credits to which he might be entitled. The trial below, which was to the court without a jury, involved six major transactions and many subsidiary transactions. The trial court entered findings of fact and conclusions of law in regard to each of those transactions. When all of the findings were resolved and the credits which had been established were offset, judgment was entered in favor of Pellerin and against Reed in the amount of $2,063.72. This appeal questions the findings of the court below as to two of these transactions and also disputes certain miscellaneous credits established by the trial court. Since these transactions are not interrelated, they can best be examined separately.

## I. Barnes Hospital Transaction.

This transaction involves an indebtedness of Reed to Pellerin evidenced by a note for $12,631.00 and apparently secured by a conditional sales contract on two pieces of laundry equipment. The note in question was negotiated by Pellerin to a finance company but has since been reacquired from that company by Pellerin. On the original note of $12,631.00 Pellerin claims that there is a balance due of $6,436.00, which he seeks to collect in this action. In the trial below Reed successfully urged the defense of usury. Under the Arkansas law a lender who contracts for usurious rates forfeits the amount of his loan and the interest thereon. Arkansas Constitution, Art. 19, Sec. 13; Arkansas Stat.Ann. Sec. 68–611 (1947). The principal question presented below and raised again in this court is whether or not the note in question was given in connection with a loan or a sale of equipment. The trial court found the transaction to be a loan. In reviewing this finding, it is necessary to consider the facts surrounding the execution of the note in question.

Reed's laundry in Hot Springs, Arkansas, was destroyed by fire in September, 1956. Following this loss Reed was making various efforts towards re-establishing his laundry business there. Sometime around December, 1956, he learned that the Barnes Hospital at St. Louis, Missouri, had installed new laundry facilities and was attempting to sell its used equipment. Reed went to St. Louis to examine the equipment and agreed to purchase an ironer and an extractor for a total price of $3,250.00. He made a $200.00 deposit on the equipment at the time and arranged with the hospital to store the equipment there until the balance was paid. In March, 1957, Reed sent the hospital an additional $800.00, leaving a balance due of $2,250.00. At this point he sought Pellerin's help in financing the balance remaining to be paid. This resulted in Reed's executing the note which the trial court found to be usurious. There is a sharp conflict in the testimony of Reed and Pellerin as to the precise na-

ture of the transaction which resulted in the execution of that note.

Pellerin testified that when Reed approached him for help in financing the purchase of the equipment in question Reed told him that the cost of the equipment involved was $10,500.00, that he had made a $1,000.00 down payment, and that he wanted Pellerin's help in financing the balance. He testified that he told Reed that because this was the type of equipment that he sold in the normal course of his business he could not finance it without making his customary operating profit of thirty per cent. Pellerin maintains that he arranged for Reed to purchase the equipment in question from the Barnes Hospital in Pellerin's behalf, acting as Pellerin's agent, so that the latter could then resell the same to Reed at his customary thirty per cent markup plus interest and finance charges. Pellerin maintains that the $9,500.00 which he advanced to Reed in connection with this transaction was not a loan evidenced by the note in question but rather the money with which Reed was to purchase the equipment in Pellerin's behalf. Under Pellerin's theory, the note was given as the purchase price for Pellerin's resale of the equipment to Reed. Pellerin testified that the amount of the note in question was computed on the basis of an $8,500.00 cost to him for the equipment, plus a thirty per cent profit of $2,550.00, plus $5.58 legal expenses and $1,575.42 carrying charges. He based his $8,500.00 cost figure on a price of $10,500.00 from the hospital, less the $1,000.00 down payment which Reed had made, less another $1,000.00 which Pellerin threw off for not having to pay a salesman's commission on the sale to Reed.

Reed's testimony presents an altogether different version of the circumstances surrounding his execution of the note in question. He testified that he made known to Pellerin from the very beginning the fact that the price of the two pieces of equipment at the Barnes Hospital was only $3,250.00 and not, as Pellerin contends, $10,500.00. He testified that he told Pellerin that he was buying the equipment in question, that he wanted financing for its acquisition, and that he wanted to borrow as much against the equipment as he could so that he could have extra cash to use as operating capital in his proposed new laundry business. It is Reed's contention that he was negotiating for a loan from Pellerin to be secured by the Barnes Hospital equipment, and that in connection with this Pellerin sent him the $12,631.00 note to be signed by him so that Pellerin could attempt to sell it to a finance company. At the same time a conditional sales contract (from Pellerin to Reed) was executed on the two pieces of equipment still located at the Barnes Hospital. Reed claimed in his testimony that he did not know at the time he sent this note to Pellerin just how much cash he would actually realize, as this was somewhat dependent upon how much Pellerin would be able to get from negotiating the note. Reed indicated that he expected to receive substantially more than he did for the note and never understood that Pellerin was to retain such a substantial amount of the proceeds received from the finance company.

To substantiate his theory of a sale, Pellerin relies in part upon an invoice which he sent to Reed, dated May 22, 1957, covering the ironer and extractor in question. The invoice in question shows the total price of the equipment to be $14,631.00 (including interest and carrying charges) and shows a down payment of $2,000.00. A credit memorandum which accompanied the invoice identified the down payment as a $2,000.00 allowance for a "junk trade-in." Both parties concede that there never was any junk trade-in involved nor was it contemplated that there would be. The exact reason for this purely "paper" transaction is not made clear although Reed contends that the fictional down payment was designed to aid in the negotiation of the note to a finance company.

The $9,500.00 advanced to Reed by Pellerin in connection with this Barnes Hospital transaction was made by two

checks, the first for $1,000.00 dated June 11, 1957, and the second for $8,500.00 dated June 15, 1957. Reed testified, however, that he actually received the $1,000.00 check before he executed the note dated May 29, 1957, which he thought was undated when he returned it to Pellerin. It appears that Reed took no immediate steps to pay the balance due the Barnes Hospital after receiving this money from Pellerin. He did nothing in this respect before May, 1958, when the hospital notified him that the building housing the equipment in question was being torn down and that he would have to remove it. At this time Reed went to St. Louis with a mechanic from his laundry with the intention of removing the ironer and extractor. While in St. Louis, Reed agreed to purchase another extractor from the hospital for $450.00. At about the same time he arranged to sell the ironer to the Vickers Laundry in Fayetteville, Arkansas. Pellerin was contacted in regard to this transaction and agreed to help finance the deal. The price of the ironer was fixed at $6,000.00, the Vickers Laundry paid $500.00 down to Reed, and Pellerin was to finance the balance. Reed testified that Pellerin agreed to give him credit on his indebtedness for the payments made to Pellerin by Vickers on the $5,500.00 balance. At the time he removed the equipment from St. Louis, Reed paid the Barnes Hospital $2,000.00. This left a balance owing of $250.00 on the original two pieces of equipment plus $450.00 for the additional extractor. The $700.00 balance owing the Barnes Hospital had not been paid at the time of the trial.

Reed, on his way back to Hot Springs, delivered the ironer to Vickers in Fayetteville where one of Pellerin's men helped set it up. The two extractors were taken on to Hot Springs and stored. It appears that one of these extractors was later sold and delivered to a laundry in Pensacola, Florida, in another deal financed by Pellerin. The Florida laundry refused to accept the equipment, however.

The trial court found that the transaction in question was a loan and not a sale. That finding is sustained by substantial evidence. Chronologically, the note in question is dated May 29, 1957, while the checks by which Pellerin advanced the $9,500.00 to Reed are dated June 11, 1957, and June 15, 1957. The invoice which was purportedly sent to Reed from Pellerin in connection with the alleged "sale" of the equipment to the former by the latter was dated May 22, 1957. The timing of these transactions tends to negative Pellerin's theory of a purchase and resale. Under Pellerin's theory, the $9,500.00 was advanced to Reed so that Reed could purchase the equipment on Pellerin's behalf. This allegedly was done so Pellerin could sell the equipment back to Reed at profit. Yet, the invoice which Pellerin relies upon to establish the fact that there was a sale fixes the date of such sale prior to any steps by Pellerin to purchase the equipment. Similarly, the fact that the note was executed before the checks is inconsistent with Pellerin's theory that the note was to cover a sale of equipment which he had purchased with the proceeds of the checks. The dates appearing on the note and checks are much more consistent with Reed's contention that the checks represent the proceeds of a loan obtained for the note.

Also corroborative of Reed's version of the transaction is a letter from Pellerin to Reed dated June 17, 1957, which is a part of the record. The letter states in part:

"Enclosed is our check No. 46885, dated June 15th, 1957, in the amount of $8,500.00, which makes proper payment to you in connection with the item of $9,500.00 we discussed less the recent advance of $1,000.00.

"We had a close call on this one, however, I am glad to bring it to a satisfactory conclusion for you.

"At this time it will be necessary for you to furnish me with the Bill of Sale in connection with the Flatwork Ironer, Extractor and Hoist

that you will receive from [the hospital] * * * and which should be marked 'Paid.' "

In testifying, Pellerin stated that he was referring in this letter to the problems incident to selling Reed's note to the finance company. With this explanation the statements quoted are certainly subject to the interpretation that the $9,500.00 referred to was Reed's share of the proceeds received upon the negotiation of his note. This, of course, is entirely inconsistent with Pellerin's theory that the note was given for the equipment and not for the cash.

Because Reed never paid the Barnes Hospital in full, he never received the bill of sale referred to in the above communication. Pellerin contends that the fact he requested a bill of sale is corroborative of his version of the transaction. Whatever inferences may be drawn from this request, it is nonetheless clear that at all times pertinent to the transactions in question the Barnes Hospital was the undisputed owner of the equipment involved.

In its findings the trial court stated:

"Reed contacted Pellerin in an attempt to get him to finance the Barnes transaction. Reed stated that he wanted as large a loan as possible on the equipment so as to have extra capital for his proposed new laundry in Hot Springs."

As has previously been mentioned, Reed testified that he told Pellerin that the cost of the Barnes Hospital equipment was $3,250.00. Although Pellerin claimed that he understood the price to be $10,500.00, the trial court had the right to believe Reed's version. Viewing this evidence, as it must be viewed, in the light most favorable to Reed, it sufficiently establishes that both parties were aware that only about one-third of the $9,500.00 advanced by Pellerin was needed for the purchase of the laundry equipment. This negatives the theory that the transaction was a sale and suggests a loan of "extra capital" for Reed's proposed new laundry.

Since we find that the trial court properly determined the transaction in question to be a loan, the finding below of usury would seem to be clearly justified under the Arkansas law. The applicable provision is found in the Arkansas Constitution, Art. 19, Sec. 13, and reads as follows:

"All contracts for a greater rate of interest than ten percent per annum *shall be void, as to principal and interest,* and the General Assembly shall prohibit the same by law." (Emphasis supplied.)

The Arkansas General Assembly has enacted such a prohibition in Arkansas Stat.Ann. Sec. 68–611 (1947). On the basis of the thirty-six month financing involved on the note in question, Pellerin, in receiving the $12,631.00 note in exchange for $9,500.00 cash, received interest well in excess of ten per cent per annum. This is a clear violation of constitutional and statutory limitations referred to and renders the obligation void both as to principal and interest.

Pellerin contends, for the first time in this court, that the transaction is to be governed by the usury laws of Louisiana rather than by the Arkansas law relied upon by the trial court. Without presuming to decide the conflict of laws question on the merits, it is clear that it may not be injected into the case for the first time on appeal. This principle is well illustrated by Prudential Ins. Co. v. Carlson (10th Cir.1942), 126 F.2d 607, 611–612, a case involving a New Jersey contract tried in a Kansas federal court. The court therein stated:

"It seems to be admitted that attorneys' fees are not recoverable under the laws of New Jersey. The court therefore erred in entering judgment for the recovery of such fees.

"It does not follow, however, that such error requires a reversal of the case. At no stage of the proceedings was the attention of the trial court called to the New Jersey law. Neither in the pleadings, at time of trial,

nor in the proceedings subsequent to the trial and before notice of appeal, was the right to recover attorneys' fees challenged by appellant. And while federal courts take judicial notice of the laws not only of the forum but also those of other states, * * * that means no more than that one relying upon a statute of a foreign state need not plead it. It does not follow, however, that a court actually knows or considers the law of the foreign state, and one relying upon such a law is not relieved from calling it to the attention of the court at a proper time. If this is not done, failure of the court to apply the foreign law may not be assigned as error for the first time on appeal. Great American Ins. Co. v. Glenwood Irr. Co., 8 Cir., 265 F. 594."

In the present case there is nothing in the record to show that the possible application of the Louisiana law was called to the trial court's attention and rejected by that court. Absent this there can be no error.

## II. Benton Laundry Transaction.

At the time Reed's Hot Springs laundry burned in 1956 he was also operating a small laundry at Benton, Arkansas, some thirty miles away. In an effort to retain his Hot Springs laundry business until he was financially able to rebuild, he transported his Hot Springs laundry collections to Benton for processing. This necessitated some expansion of the facilities at Benton. As a result, Reed purchased additional laundry and dry-cleaning equipment from Pellerin in April and November of 1957 and executed notes to the latter in amounts of $46,-552.80 and $13,684.36 secured by conditional sales contracts.

Early in 1958 the Craighead Laundry in Hot Springs was put up for sale. Reed was very interested in purchasing it but realized that he would first have to be free from his obligations on the new equipment at the Benton plant which at that time exceeded $40,000.00. He discussed the matter with Pellerin and it was decided that the best way to handle the situation would be to sell the Benton laundry as a going business. Pellerin agreed to give some assistance in securing a buyer for the plant and did in fact find a buyer named Vernon Hogue. It is the precise nature of the arrangement between Reed and Pellerin pursuant to Hogue's acquisition of the Benton laundry which is in dispute.

At the trial, Pellerin and Reed were in direct conflict in their testimony as to the agreement between them in connection with Hogue's taking over the Benton plant. Reed testified that it was agreed that if Pellerin found a purchaser for the laundry Reed was to lease the building housing the facilities to the purchaser. In addition, Reed was to convey to Pellerin the unencumbered laundry equipment in the Benton plant, which had an agreed value of $9,235.00. Pellerin would then be in a position to transfer to the purchaser the entire equipment in the plant, as he already held title to the encumbered equipment under conditional sales contracts. According to Reed's testimony, if Pellerin completed such a transaction Reed's notes for the encumbered equipment were to be returned to him and he was to be given credit on another account he had with Pellerin for the amount of his equity in the encumbered equipment in the Benton plant plus $9,235.00 for the unencumbered equipment. It is Reed's contention that he was to have nothing to do with the arrangements to be worked out between Pellerin and the purchaser as to terms, and that the situation was such that if Pellerin secured a buyer Reed was to turn the equipment in question over to Pellerin to be sold by the latter to the purchaser.

Pellerin testified that his agreement with Reed was that if he negotiated a sale of the equipment to a purchaser, in this case Hogue, for a price (excluding interest and carrying charges) exceeding the principal balance yet owing by Reed on such equipment, then the latter would be entitled to a credit, upon

payment of the purchase price by Hogue, for the amount of this difference. Pellerin maintains, however, that the risk of nonperformance was not to be borne by him and that if the purchaser defaulted Pellerin was to keep Reed's unencumbered machinery plus the encumbered machinery (in which Reed had a substantial equity) in exchange for releasing Reed from the indebtedness remaining on the two notes in question. Pellerin urges that Reed is, therefore, entitled to no credit arising out of the transaction with Hogue for the reason that (1) there was never any sale to Hogue but rather an option which Hogue failed to exercise; and (2) that even if there has been a sale to Hogue any credit due Reed is conditioned upon Hogue's payment of the notes given for the purchase price upon which the latter has defaulted.

The trial judge in his findings of fact found the transaction to be as follows:

"Pellerin agreed to sell and finance the complete laundry, and, *after the sale was consummated,* to credit Reed's account for the personal property in the laundry conveyed by Reed to Pellerin and for his equity in the other machinery." (Emphasis supplied.)

In addition, the trial court found that a sale had been consummated between Pellerin and Hogue and, therefore, that Reed was entitled to a credit. It would seem that such findings necessarily reject Pellerin's theory that any credit due Reed was to be conditioned upon the purchaser's financial performance for the trial court in its findings noted the fact that Hogue was in arrears on his payments on notes issued for the Benton equipment.

In examining the somewhat insufficient record before this court, it is clear that there is ample evidence to support the finding of the court below that Reed is entitled to certain credits in connection with the transfer of the Benton laundry business to Hogue. Reed's testimony alone is sufficient to preclude this court finding otherwise for where, as here, there is a clear conflict between the only two principal witnesses to a transaction the question presented is largely one of credibility and must be resolved by the trier of fact. See Noland v. Buffalo Ins. Co. (8th Cir.1950), 181 F.2d 735, 738; Cleo Syrup Corp. v. Coca-Cola Co. (8th Cir.1943), 139 F.2d 416, 417–418, 150 A.L.R. 1056.

In addition, Reed's version of the transaction is corroborated to some extent by a letter from Pellerin to Reed's accountant which is part of the record here. In this letter Pellerin lists figures showing that a credit had in fact been made to Reed's account in the amount of $18,143.58 for a "sale to Vernon Hogue." The letter is dated June 25, 1959, which is ten months after Hogue took over the Benton plant, and at which time, according to the testimony of both Pellerin and Hogue, the latter was already in arrears on his monthly payments. It also appears of record that at this time Pellerin had been apprised of Reed's understanding of the effect of the transaction by a letter written to Pellerin by Reed's attorney in August, 1958, at approximately the same time that Hogue took possession of the laundry. These facts, considered as a whole, support the trial court's finding that Reed became entitled to the credit at the time a sale was consummated between Pellerin and a purchaser of Pellerin's choosing and was not to be conditioned upon the financial performance of the purchaser.

Furthermore, the trial court's finding that a sale of the Benton laundry had been consummated between Pellerin and Hogue is supported by substantial evidence. The latter, in connection therewith, executed three conditional sales contracts and three promissory notes totaling $82,350.00 and delivered them to Pellerin. Although these instruments were not dated, and it appears that it was agreed between Pellerin and Hogue that only one of the three notes was to be immediately negotiated, this does not lend any support to Pellerin's theory that Hogue was only given a one-year option

to purchase the laundry which he never exercised. There apparently *was* a one-year written option agreement for the purchase of the laundry executed by Hogue during the preliminary negotiations with Pellerin but Hogue testified that this was superseded by the execution of the conditional sales contracts which in effect constituted a purchase of the business by him. Pellerin in his argument in this court does not stress or rely upon this preliminary written option agreement. Hogue was in continuous possession of the laundry and operating it either individually or as a partnership or corporation from August, 1958, up until the time of the trial in April, 1961. When all of these facts are considered, it appears that the trial court's conclusion that a sale had been consummated was clearly correct.

Accepting the fact that Reed was entitled to a credit upon the consummation of the Pellerin-Hogue sale, there is still left for determination the proper amount of the credit to be allowed. Pellerin challenges the computation of the credit which was made by the trial court. It should be pointed out that just as Pellerin's and Reed's testimony was in conflict as to when a credit was to arise it also conflicted as to the basis for computing the credit. Reed testified that it was agreed that his credit should be for the amount of his equity in the encumbered Benton equipment, i. e., the amount of his payments on that equipment less earned interest, plus $9,235.00, the value agreed upon for his unencumbered equipment. Pellerin testified that the basis for the credit under his agreement with Reed was to be the difference between the purchase price obtained on the sale to Hogue (absent interest and carrying charges) and the amount yet owing by Reed on the two Benton notes (reduced by unearned interest).

The portion of the findings of the trial court which has been previously quoted

in this opinion appears to adopt Reed's version of how the credit was to be arrived at. Also, the trial court in its discussion of the Benton transaction stated:

"Since a sale was consummated, Reed was entitled to credit by Pellerin for the agreed value of personal property he had conveyed to Pellerin in order to complete the sale, together with his equity in the equipment being purchased from Pellerin, in accordance with the agreement between Pellerin and Reed."

It would seem that crediting Reed for the value of his equipment, including his equity in the equipment being purchased on time, as contemplated by the court below, could and should have been done entirely independently of Pellerin's arrangement with Hogue as to price. It would seem to inhere in the trial court's findings that Reed's credit was to be fixed and certain upon the consummation of a sale by Pellerin and that the terms of that sale were entirely up to the latter and were in no way to affect Reed's credit. Nevertheless, in computing the amount of the credit to which Reed was entitled from the Benton transaction, the trial court subtracted the principal balance of $40,649.-16 owed by Reed on the two notes to Pellerin from the amount of the sale price on the Benton laundry to Hogue ($60,-880.05 not including interest and carrying charges), thus arriving at a figure of $20,230.89.[1] In addition, Reed was granted a miscellaneous credit of $2,950.00 for a down payment which he had made on the Benton equipment covered by the $46,552.80 note. An analysis of this computation by this court leads to the conclusion that it is not precisely in accord with either of the two conflicting theories referred to, or with the lower court's findings as to Reed's agreement with Pellerin.

Pellerin urges that the trial court's method of computation is in effect an

1. Actually, in the final computation of credits, this figure was reduced by $1,-939.70 for two payments of $969.85 paid to the finance company by Pellerin on Reed's larger note. There is no dispute as to this adjustment, but only as to the computation of the $20,230.89 figure.

adoption of his theory that the credit was to be the difference between the purchase price with Hogue and the principal balance remaining on Reed's Benton notes. From this he reasons that it was error for the trial court to grant the additional miscellaneous credit to Reed for the down payment on the Benton equipment as this is inconsistent with such a theory.

Reed seeks to support the credit awarded him for the down payment in question on the theory that absent such a credit he would not be reimbursed to the full extent of his equity in the equipment in question in accordance with the trial court's findings. He attempts to support the rest of the court's computation, based upon the purchase price to Hogue, on the theory that the terms of the sale to Hogue were such that the difference between the purchase price to be received by Pellerin from that transaction and Reed's unpaid balance was substantially equivalent to the value of Reed's equipment plus his equity in the equipment he was purchasing on time.

Reed urges in support of his latter contention the following facts: (1) the cost of the first Benton equipment purchased by Reed was $39,120.00 before interest and carrying charges while one of the three notes executed by Hogue to Pellerin was for the principal sum of $39,693.50; (2) the principal balance of the second note executed by Reed was $11,973.19 while one of the Hogue notes was for the principal sum of $11,951.55; (3) the third note executed by Hogue was for the principal sum of $14,235.00 and Pellerin testified that this was to cover the unencumbered machinery secured from Reed valued at $9,235.00 plus a $5,000.00 advance to Hogue for operating expenses. The trial court in figuring the purchase price paid by Hogue to be $60,880.05 did not include this extra $5,000.00 just referred to. It appears that the situation was such that while Hogue was buying a going laundry business, in the sense that that was what he was in fact getting, Pellerin was only selling the equipment.

The notes in question were related to specific items of equipment.

It seems clear that if the terms of the sale negotiated between Pellerin and Hogue were such that the principal balance to be paid by Hogue was exactly equal to the sum of the value of Reed's unencumbered equipment plus an amount identical to the principal sum Reed was paying Pellerin for the encumbered equipment, then a figure representing the value of Reed's equipment, plus his equity in the encumbered equipment, could be ascertained in the manner employed by the trial court, i. e., by subtracting the principal balance yet owing by Reed on the encumbered equipment from the principal balance of the price to Hogue. While it appears that Pellerin's price to Hogue on specific items of equipment which Reed had been purchasing on time was substantially the same as the price Reed had been charged for the same equipment, it obviously is not exactly the same. Only if the amounts were identical would the trial court's method of computing the credit result in a figure accurately representing the value of Reed's equipment plus his equity in the equipment he had been purchasing on time. Furthermore, the values just referred to can be accurately ascertained from the record without resort to the terms agreed to between Pellerin and Hogue by merely computing Reed's equity on the basis of subtracting the principal balance he owed Pellerin for the equipment from the principal sum of the original purchase price.

It is the view of this court that this discrepancy cannot be disposed of merely by saying that there can be no objection by Pellerin to the trial court's computing the credit in a manner which he himself advocated, for, under Pellerin's proposed method of computing the credit, there would have been no allowance for Reed's down payment. The very fact that the trial court granted the credit for the down payment is strong evidence that it realized the basis of the credit was to be dependent upon the value of Reed's

equipment plus his full equity in the encumbered equipment regardless of the purchase price to be paid by Hogue. This is the argument advanced in Reed's brief to support the credit granted him for the down payment. Such argument serves equally well to establish the fact that the basis for the credit was not to depend upon the terms between Pellerin and Hogue.

The discrepancy involved is in favor of Reed and against Pellerin. Since the latter complains of this on appeal, this court should modify the credit allowed by the lower court to the extent that such credit is inconsistent with its findings. The correct computation of Reed's equity in the encumbered Benton equipment would seem to be as follows:

| | |
|---|---|
| $39,120.00 | cost of equipment covered by first note after down payment[2] |
| $ 2,950.00 | down payment |
| $42,070.00 | total cost of equipment covered by first note |
| $11,973.19 | cost of equipment covered by the second note[3] |
| $54,043.19 | total cost of equipment covered by both notes |
| less $40,649.16 | principal balance yet owing by Reed as found by the trial court |
| $13,394.03 | Reed's equity in the equipment |

When the amount of Reed's equity is added to the $9,235.00 amount which was to be credited to Reed for his unencumbered equipment, the total credit becomes $22,629.03. This is $551.86 less than the credit awarded Reed by the trial court for this transaction (including the allowance for down payment). For this rea-

son the judgment below should be modified by increasing the judgment in favor of Pellerin by this amount.

### III. Miscellaneous Credits and Adjustment.

The trial court, in offsetting the credits which it determined to exist in the various transactions involved below, found that Pellerin was entitled to credits totaling $11,697.20 and that Reed was entitled to credits totaling $9,333.48. In entering final judgment the court arrived at the figure of $2,063.72. No reason is apparent for this discrepancy other than a $300.00 error in arithmetic. On appeal Reed concedes the error and this court accordingly will modify the judgment so that Pellerin is entitled to an additional $300.00.

■ Other errors in the computation of miscellaneous credits are urged by Pellerin. These alleged errors involve credits granted Reed for the return of two pieces of laundry equipment purchased from Pellerin. Reed carried an open account with Pellerin and the trial court in its findings determined that such account carried a $389.11 credit balance in Reed's favor. In addition, the trial court granted a credit to Reed in the amount of $658.00 for the return of a Tag-O-Lectric laundry machine. Pellerin contends that the return of the Tag-O-Lectric machine was credited to Reed's balance on his open account and thus merged in the credit awarded Reed on that account. He also contends that there was a $791.38 error in computing the balance of the open account due to the fact that a certain credit had been entered twice. Whatever merit exists in these contentions, the printed record before this court is insufficient to enable it to decide these questions. Appellants have not provided this court with any of that portion of the record dealing with Reed's open account. Even the trial court's findings as

2. This figure is taken from a worksheet prepared by Pellerin and introduced at the trial by Reed. In his brief in this court, Reed relies upon these figures as showing the price charged Reed for the

equipment before interest and carrying charges were added.

3. This figure comes from the same source described in footnote 2.

to that account have been omitted. Appellants here refer only to an exhibit attached to their reply brief in the court below. This exhibit was not part of the evidence and may not be considered by this court. Pursuant to Rule 10(d) of this court, 28 U.S.C.A., it treats as waived these issues which cannot properly be determined from the record as printed. See Zander v. Lutheran Brotherhood (8th Cir. 1943), 137 F.2d 17, 21.

The judgment of the court below is modified so as to reduce Reed's credit for the Benton transaction by $551.86 and to correct the $300.00 error in the final offsetting of credits. This has the effect of increasing the judgment in favor of appellants to the principal sum of $2,915.-58. The judgment as so modified is affirmed.