**PEACOCK & PEACOCK, INC.,**
Appellant,

v.

**STUYVESANT INSURANCE COMPANY,**
Appellee.

No. 17355.

United States Court of Appeals
Eighth Circuit.

June 8, 1964.

Boyce R. Love, Little Rock, Ark., made argument for appellant and filed brief with Ben Allen, Little Rock, Ark.

James I. Teague, of McMillen, Teague & Bramhall, Little Rock, Ark., made argument and filed brief for appellee.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and DAVIES, District Judge.

BLACKMUN, Circuit Judge.

In this diversity case, removed from state court, Peacock & Peacock, Inc., claims coverage for a March 1961 poultry loss under a policy issued by Stuyvesant Insurance Company to General Mills, Inc. The case was tried to the court. Judgment in favor of the defendant was entered.

Many of the facts are stipulated. Peacock was engaged in the production and marketing of eggs and raised its own layers. General Mills was in the business of selling poultry feed and supplies. It distributed its products through dealers and by sales direct to producers. Much of this portion of its business was done on credit; it also lent money to customers to finance their purchase of chicks.

On August 9, 1960, Stuyvesant and General Mills had outstanding an agreement constituting a "master policy of insurance". By this agreement Stuyvesant insured "the interest, if any, of GENERAL MILLS, INC. and such Poultry Feed Dealers of GENERAL MILLS, INC. as may be endorsed hereon as additional Assured(s), in flocks or houses of live chicks owned by such Dealer's and raised by Grower(s) under contracts or Growing Agreements approved by GENERAL MILLS, INC." The protected hazards included death of chicks resulting from tornado. Excluded from coverage, with an excess exception, was any loss to which other insurance was applicable.

Altman-Singleton Co. was a general agent for Stuyvesant. It supplied General Mills with printed forms. One of these was a monthly report form. Another was an "Advice of Insurance" form. A letter of instruction from Altman-Singleton to General Mills stated that the advice forms "are given to growers to confirm coverage". The report form called for information as to the name and address "of Grower", date placed, term, rate, number of poultry, and premiums. The advice form was one designed for use by General Mills to report to the "Raiser" that "we have obtained insurance, under the above policy, on the above indicated type of Chickens, during their growing

period, for what ever term we report to the Insurance Company on our monthly report of placement of Chickens on your premises". The coverage, including tornado, and the exclusions, including loss covered by other insurance, were outlined in the form; it also contained a recital that "the Raiser Assured agrees to immediately, within 24 hours of loss, report such loss to the Insurance Company or its duly authorized Agency".

By August 9, 1960, Peacock had purchased and owned 9,000 pullets. This purchase and the chicks' feeding and medical program were financed by General Mills. The pullets were initially located on a broiler farm near Trumann, Arkansas, while Peacock was constructing housing facilities near Hickory Ridge. On August 9, at Peacock's request, General Mills delivered to Altman-Singleton its check for the insurance premium on the 9,000 birds and forwarded its advice form to Peacock. This placement was noted by General Mills on its monthly report form sent in to Altman-Singleton. General Mills charged the amount of the premium to Peacock's account.

On August 22 General Mills' regional credit manager advised Altman-Singleton that Peacock had lost 60 pullets in a windstorm two days before. The claim form for this was sent to Peacock.

About October 25, 1960, the 9,000 pullets with their unconsumed feed and medicine were moved from Trumann to Peacock's Hickory Ridge farm and commingled with other layers owned by Peacock. This was with the knowledge and permission of General Mills.

On October 25 Peacock obtained a "Scheduled Property Floater Policy" with Boston Insurance Company. This afforded coverage against loss by death due to tornado of all birds owned by Peacock including the 9,000 to which the Stuyvesant policy had application. It did not cover loss of unconsumed feed and medicine. It contained an exclusion-excess clause with respect to other insurance. Boston's liability, in the event of loss, was to be measured by a percentage, dependent upon age, of a limit of $2 per bird. Thus, after October 25, both policies had presumptive application to the 9,000 pullets. Altman-Singleton apparently was not aware, until after the loss, of the issuance of the Boston policy, of the additional birds owned by Peacock, of the commingling, or of the move from Trumann.

A tornado struck Hickory Ridge on March 12, 1961. This resulted in 14,168 dead layers and an agreed amount of loss of unconsumed feed and medicine. Both insurers were advised. Each employed the same adjustment bureau to investigate. Stuyvesant eventually denied liability. Boston paid out $23,802.24 on its contract by a check drawn to Peacock, its attorneys and General Mills, and took from Peacock a loan receipt reciting that this amount was to be repaid only to the extent that Peacock effected recovery elsewhere. Boston's payment, after the attorney's fee, was applied by General Mills on Peacock's account.

Stuyvesant defended the action on the grounds that (a) there was a fatal defect of parties defendant (General Mills and Boston); (b) Peacock was not an assured under Stuyvesant's policy; (c) even if Peacock were an assured, there was no coverage because of the commingling and the removal of the birds from their Trumann location; and (d) the presence of the other insurance-exclusion clause relieved it of liability. Judge Henley rested his decision for the defendant on his conclusion that Peacock was not an assured. Peacock's appeal is confined to this issue.

 Initially, and even on our own initiative, we must be sure that the $10,000 minimum, now required by 28 U.S.C. § 1332 for federal court diversity jurisdiction, is in controversy. Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338 (1934); Texaco-Cities Service Pipe Line Co. v. Aetna Cas. & Sur. Co., 283 F.2d 144, 145 (8 Cir. 1960); Rule 12(h), F.R.Civ.P. Peacock, by its original complaint filed in state court, sought judgment, exclusive of interest and costs, for $8,709.10 (the amended

complaint, filed in federal court, claims $8,539.22) plus "a 12% penalty thereon" and "a reasonable attorneys' fee", both "as provided by law". This latter reference apparently is to Ark.Stat. § 66–3238 * (successor, in 1959, to § 66–514). Neither the complaints nor Stuyvesant's removal petition contain any specific allegation as to what a reasonable attorneys' fee here would be. The petition, however, does assert, "all of which aggregates more than $10,000.00". It is obvious that the basic amount plus the 12% produce a figure less than $10,000, and that, for federal jurisdiction to attach, both the 12% and the attorneys' fee must qualify as part of the "matter in controversy" and that the fee must be greater than the difference between $10,000 and the basic claim increased by 12%.

■ The decided cases provide an affirmative answer as to includability. That the 12% damages addition, although called a penalty in the complaints (see, as to this, Life & Cas. Ins. Co. of Tennessee v. McCray, 291 U.S. 566, 572–573, 54 S. Ct. 482, 78 L.Ed. 987 (1934)), is includable in computing the amount in controversy, and is not to be relegated to the category of costs excludable by the very terms of § 1332, is apparent from Mutual Life Ins. Co. of New York v. Marsh, 185 Ark. 332, 47 S.W.2d 585, 586 (1932); Pacific Mut. Life Ins. Co. v. Bierman, 188 Ark. 703, 67 S.W.2d 577 (1934); and State Farm Mut. Auto. Ins. Co. v. Pennington, 215 F.Supp. 784, 786, footnote 1 (E.D.Ark.1963), aff'd 324 F.2d 340 (8 Cir.). See Lydon v. New York Life Ins. Co., 89 F.2d 78, 79 (8 Cir. 1937), cert. denied 302 U.S. 703, 58 S.Ct. 23, 82 L.Ed. 543, and American United Life Ins. Co. of

Indianapolis, Ind. v. Franklin, 97 F.2d 76, 77 (8 Cir. 1938).

And Missouri State Life Ins. Co. v. Jones, 290 U.S. 199, 54 S.Ct. 133, 78 L. Ed. 267 (1933), an Arkansas case, is flatly to the effect that, despite the Arkansas statute's provision that the attorneys' fee is "to be taxed up as a part of the costs" and "collected as other costs", the fee is to be included in determining jurisdictional amount. To the same general effect are Mutual Benefit Health & Acc. Ass'n v. Bowman, 96 F.2d 7, 9 (8 Cir. 1938), additional opinion 99 F.2d 856, cert. denied 306 U.S. 637, 59 S.Ct. 485, 83 L.Ed. 1038; Crescent Lumber & Shingle Co. v. Rotherum, 218 F.2d 638, 639 (5 Cir. 1955); Stokes v. Reeves, 245 F.2d 700, 702 (9 Cir. 1957); Pacific Mut. Life Ins. Co. v. Bierman, supra, p. 578 of 67 S.W.2d. See Lydon v. New York Life Ins. Co., supra, p. 79 of 89 F.2d, and American United Life Ins. Co. of Indianapolis, Ind. v. Franklin, supra, p. 77 of 97 F.2d.

■ Although we are not here favored with a definite allegation as to the amount of the attorneys' fee and the pleadings in this respect therefore fall short of desirable specificity, we are satisfied that the general assertion in the petition for removal as to aggregate amount is sufficient. In this connection, we note with interest both Pacific Mut. Life Ins. Co. v. Bierman, supra, p. 578 of 67 S.W.2d, and Catalogue Direct Sales, Inc. v. United States Fire Ins. Co., 163 F.Supp. 308, 309 (E.D.Mo.1958).

We consequently conclude that federal jurisdiction is established.

This brings us finally to the sole issue on the merits, that is, whether Peacock

---

* § "66–3238. Suits against insurers—Damages and attorney fees on loss claims. —In all cases where loss occurs (on) and the * * * casualty * * * insurance company * * * liable therefor shall fail to pay the same within the time specified in the policy, after demand made therefor such * * * firm * * * shall be liable to pay the holder of such policy, in addition to the amount of such loss, twelve (12%) per-

cent damages upon the amount of such loss, together with all reasonable attorneys' fees for the prosecution and collection of said loss; said attorney's fee to be taxed by the court where the same is heard on original action, by appeal or otherwise, and to be taxed up as a part of the costs therein and collected as other costs are, or may be by law collected * * *."

was an assured under the agreement between Stuyvesant and General Mills.

Peacock asserts and stresses (a) that the insuring clause covered not only the interest of General Mills but, as well, the interest of any poultry feed dealer "as may be indorsed hereon" and thus was not restricted in its application to General Mills; (b) that the contract measured liability by "actual invoice cost to the Dealer" and, because only Peacock incurred invoice cost, it thus was a dealer; (c) that the agreement required record keeping performed only by Peacock; (d) that the requirements that a dealer-assured report a loss immediately, retain dead birds for inspection and, in the event of no inspection, count them before witnesses prior to disposal, had sensible application to Peacock and not to General Mills; (e) that, while Peacock did not fit in all respects the contract's term "Dealer", it came closer to it than to the contract's term "Grower"; (f) that General Mills' regional credit manager, in a letter of August 22, 1960, to Altman-Singleton, recited that Peacock "requested" that its 9,000 pullets be insured and that Peacock "has elected to cover his birds"; (g) that the advice form was sent to Peacock and bore the same date; (h) that at no time did Stuyvesant indicate to Peacock that its policy did not insure Peacock's interest in its chickens; (i) that the policy insured General Mills only to the extent of an interest it possessed in chickens owned by dealers; (j) that the advice form thrice referred to "Raiser Assured", as contrasted with the agreement's use of the term "Dealer Assured"; (k) that the form was used by Stuyvesant to remedy deficiencies in the agreement, and Peacock was an owner-raiser which desired coverage for its own interest; and (l) that the testimony of an Altman-Singleton partner, the apparent payment of the small early claim direct to Peacock, and letters from General Mills' credit manager, constituted "overwhelming evidence" that the parties themselves regarded the agreement as applying to Peacock as an insured.

Although Peacock's argument is one which can appropriately be made, we are no more convinced by it than was the trial court. The answer to the case lies, we think, in a careful analysis of the agreement between Stuyvesant and General Mills, of the purpose of that agreement, and of the end the parties were desiring to achieve.

■ The following factors in the aggregate convince us of the correctness of the trial court's conclusion: (a) No indorsement of any dealer, and particularly not of Peacock, was ever made on the contract. (b) Peacock was not a poultry feed dealer; it was a poultry raiser. (c) The policy was obviously intended to afford protection to General Mills or its designated dealers in financing operations. It is true that it charged each premium increment to the particular grower which was financed but this is a common practice where a mortgagee requires insurance protection. (d) The willingness of Peacock to have the Stuyvesant insurance in effect is logically attributable to a desire to have General Mills protected with consequent distinct advantage to Peacock, in the event of loss, on its account payable. (e) Stuyvesant received its premium payment from General Mills and not from Peacock. (f) There was no dealer intervening between General Mills and Peacock. The former acted here as both manufacturer and dealer when it supplied its products direct to Peacock. This did not serve to promote Peacock to dealer status. Neither did it convert the contract's phrase "poultry feed dealer" into an ambiguous term. (g) We do not read the insuring clause to apply to General Mills' interest in chickens owned only by a dealer and to exclude any interest it had in chickens not owned by a dealer. It applied, and had sensible application only if it applied, to General Mills' interest in chickens owned by dealers or in those owned by growers where General Mills itself, as here, occupied the dealer's position. It is directed to the financing entity, whether that be General Mills or one of its deal-

ers; it is not directed to a grower such as Peacock. (h) The advice form was given by Stuyvesant to General Mills, not to Peacock. General Mills filled it out and sent it to Peacock. The form was a means whereby General Mills informed its customers that insurance had been obtained for General Mills' interest in chickens and that the customer thus had indirect protection, in the event of loss, upon its obligation to General Mills. (i) The advice form seemed to be exactly what its name implied, that is, a means of providing information. It was not an insurance contract between Stuyvesant and Peacock. (j) Admittedly the choice of the term "Raiser Assured" in the advice form was a poor one. This lapse in language, however, did not transmute the form into a contract of insurance. (k) The agreement's method of calculating liability for loss is significant. Loss is to be based, not on market value, the measure normally anticipated when an owner is the assured, but on invoice cost which ties into credit extended. This points to General Mills' investment rather than to Peacock's ownership. (l) Standing in direct contrast are Peacock's taking out the Boston policy, its affording specific protection to Peacock on the 9,000 birds as well as on others, and its measuring loss liability by value. (m) There was uncertainty in the mind of Peacock's general manager as to coverage under the Stuyvesant-General Mills agreement. This was evident, arguably at least, from his testimony that "I wanted to make sure that we had everything insured", that "We weren't sure that we had insurance with Stuyvesant", and that "I was just trying not to make any mistake", and, more forcefully, by Peacock's taking out its policy with Boston. Peacock was not misled and it did not act to its detriment. (n) What deficiencies there were in the form of the agreement so far as its possible application to Peacock is concerned are not too significant. It was issued not to Peacock but to General Mills and we are not advised of any deficiencies in it as to General Mills' protection. (o) The evidence claimed by Peacock as demonstrating that the parties themselves regarded Peacock as an assured is only indicative of an awareness on the part of all that the agreement had application to the 9,000 Peacock birds. This does not equate with Peacock's being an assured thereunder and in a position to collect from Stuyvesant for loss or that the parties so regarded it. If the small early claim was paid direct to Peacock, this would be an opposing factor but the proof of that payment on this record is far too obscure and sketchy for us to give it much significance.

We recognize, of course, the old maxim that contract ambiguity is to be resolved against the scrivener. Great Am. Indem. Co. of New York v. Saltzman, 213 F.2d 743, 746 (8 Cir. 1954), cert. denied 348 U.S. 862, 75 S.Ct. 85, 99 L.Ed. 679. But reading the contract as a whole persuades us, as it did the trial court, that this was coverage afforded to General Mills and not to Peacock; that its provisions upon which Peacock relies, while no model of impeccable draftsmanship, are not so ambiguous as to permit application of the rule of construction urged by Peacock; that all the attendant facts illustrate the parties' own awareness that Peacock was not an assured; and that the advice form was not an insurance contract. In short, the agreement was a policy providing coverage for the financing organization and benefiting the borrower only secondarily and indirectly. After all, it has been noted more than once that we are not to import into a contract any ambiguity which otherwise does not exist. Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 76 L.Ed. 416 (1932); Massachusetts Bonding & Ins. Co. v. Julius Seidel Lumber Co., 279 F.2d 861, 865–66 (8 Cir. 1960); Roth v. Western Assur. Co., 308 F.2d 771, 774 (8 Cir. 1962).

Mention should perhaps be made of another argument asserted by Peacock in its brief, viz., that, because Stuyvesant before trial based its denial of coverage on the unreported change of the birds' location, it cannot at trial rest

its denial of coverage on another ground. Apparently there is no Arkansas case on this point. We are satisfied, however, that this rule of law, if it exists in Arkansas at all, is not available to Peacock. It is bottomed on waiver and estoppel. This is affirmative matter in Arkansas. It must ordinarily be pleaded and the burden as to it is on Peacock. Aclin v. Caplener, 229 Ark. 718, 318 S.W.2d 141, 144 (1958); Moore v. Rommel, 233 Ark. 989, 350 S.W.2d 190, 193 (1961); James Talcott, Inc. v. Associates Discount Corp., 302 F.2d 443, 446 (8 Cir. 1962); Missouri Pac. R. R. v. Bartlett, 79 F.2d 275, 279 (8 Cir. 1935), cert. denied 296 U.S. 620, 56 S.Ct. 142, 80 L.Ed. 440. Here Peacock neither pleaded nor raised it as an argument before the trial court. Furthermore, waiver or estoppel may not be invoked in Arkansas to extend coverage to a point where none existed before. Montgomery v. M.F.A. Mutual Ins. Co., 250 F.2d 357, 361 (8 Cir. 1957); Standard Acc. Ins. Co. v. Roberts, 132 F.2d 794, 798–99 (8 Cir. 1942); Bankers Nat. Ins. Co. v. Hembey, 217 Ark. 749, 233 S.W.2d 637, 640 (1950).

Affirmed.