[No. 39306.    Department Two.    February 6, 1969.]

NATIONAL BANK OF WASHINGTON, *Respondent,* v. A. J. MYERS *et al., Appellants.**

*Kenneth C. Hawkins,* for appellants.

*Blair, Thomas, O'Hern & Daheim* and *Palmer, Willis & McArdle,* for respondent.

*Reported in 450 P.2d 477.

HILL, J.—This is an appeal from a judgment for $75,629.13 entered on June 14, 1966, in an action on a promissory note ($62,961.86 principal, $9,667.27 interest, and $3,000 attorney's fee). The judgment was in favor of National Bank of Washington, a national banking corporation, and against A. J. Myers and Dorothy I. Myers, his wife.[1]

There is a cross-appeal because the judgment limited the amount of attorney's fee to $3,000.

The defenses (or counterclaim and affirmative defense) to the action on the note present the only issues raised by the appellant and require an understanding of a somewhat complicated business transaction and a prior rescission action.

Dr. A. J. Myers agreed to purchase 22 units of ice manufacturing and vending equipment (two combination ice manufacturing and vending machines—one to be set up in Yakima and one to be set up in Moses Lake—together with 20 ice vending units to be set up at various locations in the Yakima Valley and Columbia Basin areas.[2] This equipment was manufactured in Fort Smith, Arkansas, by the Council Manufacturing Company (hereinafter called Council) and sold to Dr. Myers by the Modern Refrigeration Company (hereinafter called Modern) with offices in Seattle.

The 22 units of ice manufacturing and vending equipment were shipped by Council from Fort Smith. The National Bank of Washington, through its Central Yakima Branch (hereinafter referred to as the Bank), advanced the money to secure the release of the equipment from the carriers and took a promissory note from Dr. Myers in the sum of $63,044.41 to cover the advances made. A chattel mortgage on the equipment in that amount was given to the Bank as security. The note and chattel mortgage were executed April 9, 1962.

The operation of the equipment began in late April, 1962. Many operational difficulties immediately developed, the

[1] Dr. A. J. Myers (an osteopathic physician and surgeon) will be referred to throughout the opinion as though he were the only defendant and appellant.

[2] All in Yakima and Grant counties.

technical and detailed character of which we need not describe. Despite the efforts of both Modern and Council, these difficulties were not remedied. On May 24, 1962, Dr. Myers, with the knowledge and on the advice of the branch manager of the Bank, commenced an action against Modern, the seller, and Council, the manufacturer, asking for rescission of the sale and damages.

Council was dismissed from the action because it was not transacting business in the state of Washington; and the rescission action against Modern was set to be tried on March 18, 1963. Despite the pendency of the rescission action, efforts to make the machines operate satisfactorily were continued by Modern and Council, with the acquiescence and approval of Dr. Myers, through the 1962 and 1963 season.[3] Dr. Myers continued his operation of the equipment until it was shut down for the year in October, 1962. Dr. Myers never thereafter operated the equipment.

The situation, as the 1963 operating season approached, was that the rescission action was set for trial on March 18. Modern and Council still believed that the equipment could be made to operate satisfactorily; Dr. Myers was willing to let them try, but refused to accept any financial responsibility for the 1963 operation for fear of further losses.

On March 17, the day before the trial of the rescission action was to begin, an agreement was reached at a meeting in Yakima between Dr. Myers and the representatives of Modern and Council (attorneys representing all parties were present). The agreement was that Modern would pay Dr. Myers $5,000 for a continuance of the trial and as evidence of its good faith in the efforts being made to make the equipment operate satisfactorily. Council agreed to send a man from the factory in Fort Smith, Arkansas, with a truck and trailer loaded with parts for replacements and repairs and with the necessary tools.

Apparently Modern decided that if the repairs were to be satisfactory, it was necessary that the equipment be

_____

[3]The operating season for such equipment in the areas with which we are concerned seems to have been from April into October.

operated; and with Dr. Myers refusing to take any financial responsibility for the operation, Modern arranged with Vernon Stone to operate the equipment, after notifying Dr. Myers of its intention.

The $5,000 was paid. Council sent out its man with a truck and trailer loaded with parts as it had agreed. Representatives of Modern and Council worked through the season in an effort to make the equipment operate satisfactorily.

Dr. Myers' expression concerning the agreement of March 17, and what followed, was as follows:

No, they made an effort to avoid the trial as I was hoping could be done by making an agreement, as I mentioned, to put the rollers and belts in, and new doors, a third set of doors on the front, put the coin mechanism outside in a case with a key that locked it so that the coin would go directly through the mechanism rather than through the door, and would generally revamp the machines and guarantee to me that they would then work. In addition, this agreement gave me the opportunity of not only allowing them to do this, but to supervise their operation until they were certain that the changes they made had been properly made, and if I wanted to operate them after that, I could, or if it proved they were not operable——

Dr. Myers inspected the work that was being done during the summer, and insisted that certain things be done. As late as September, 1963, he "inspected a box at the insistence of Mr. Stone." He personally took one of the machines apart in July to inspect its coin mechanism into which someone had poured a coke. As he expressed it, "Although I wasn't operating the route, I was trying to help Mr. Stone where I could."

The insurance on the equipment during the 1963 season was charged to Dr. Myers' account by the Bank. In the late summer, the insurance company sent a check for $240.16 to Dr. Myers to cover a loss by vandalism. Dr. Myers turned the check over to the Bank; part of the proceeds were applied to the payment of interest and principal on the note.

The efforts by Modern and Council to repair the equipment were futile, and the trial of the rescission action commenced on October 14, 1963. Modern had become insolvent and in August, 1963 made a common law assignment for the benefit of creditors to the Seattle Association of Credit Men (hereinafter called SACM). The assignment had been accepted in September, 1963, and SACM intervened in the rescission action.

The case was tried without a jury, and it continued through November 5. The findings of fact, conclusions of law and judgment were not signed until April 8, 1964.

The judgment in the rescission action was against Modern; and against SACM as common law assignee for the benefit of the creditors of Modern, for $77,288.19,[4] together with interest thereon from May 24, 1962 (the date of the rescission).

It was, and is, the contention of Dr. Myers that the judgment should have given him a lien on the equipment he had purchased from Modern. Such a lien is given by RCW 63.04.700(5).[5] He had specifically requested a finding reading:

> That the plaintiffs have a lien on said equipment to secure the purchase price, freight, drayage, site preparation and installation in the sum of $77,980.69[6] and interest thereon from May 24, 1962, until paid. (Proposed finding of fact No. 7.)

Instead, the court made the following finding of fact:

> That the plaintiffs A. J. Myers and Dorothy Myers, husband and wife, took no action inconsistent with said election to rescind and demand for refund of the purchase price, and all actions on their part were consistent with their duties as bailee. That the operation of said equipment during the year 1962, after May 24, 1962, by said

[4]This was made up of the following items: purchase price $71,727.41; freight $2,563.20; $1,286.55 for drayage; and $1,711.03 for site preparation.

The judgment was, by its terms, only a money judgment. Dr. Myers' appeal would have been predicated on the failure of the trial court to grant him, in addition, a lien on the equipment.

[5]Hereinafter quoted on page 296.

[6]This figure exceeds by almost $700 the actual judgment of $77,288.19; a difference which is not material on this appeal.

plaintiffs was for the purpose of holding said equipment together as an operating unit and was a discharge of the duties of plaintiffs as bailee for said equipment; that during the summer of 1962 Modern Refrigeration Company, Inc., and its agents made various modifications to said equipment and made numerous repairs to said equipment; that such modifications and repairs continued through the operating season of 1962 and until the machines were shut down by the plaintiffs in October of 1962; that after shutting the equipment down in October of 1962, plaintiffs no longer operated said equipment but delivered possession thereof to Modern Refrigeration Company, Inc., and Modern Refrigeration Company, Inc., accepted possession of said equipment and arranged for the operation of said equipment in 1963 by one Vernon Stone; that at all times since such acceptance of possession by Modern Refrigeration Company, Inc., Vernon Stone has operated said equipment on behalf of such defendant. (Finding of fact No. 9.)

The effect of the judgment was to rescind the sale, grant Dr. Myers a judgment for the value of the property, freight, drayage and expenses for installation costs against an insolvent seller, and to deny Dr. Myers the remedy of a lien on the equipment.

During the 30-day period immediately following April 8, 1964 (the date when the judgment was entered), during which Dr. Myers could have given notice of appeal, he consulted with the Bank through its branch manager and was advised that rather than pursue his appeal it would be simpler, quicker, and less expensive for the Bank to foreclose its chattel mortgage on the equipment. The Bank represented that the chattel mortgage had been properly filed in Yakima and Grant counties and that it would proceed to foreclose.

The result of such a foreclosure would normally be to apply the value of the security to the payment of the note, which, of course, would have been of considerable benefit to Dr. Myers as well as the Bank.

Above and beyond this normal expectation was the fact that Dr. Myers (who was then threatening Council, which had been dismissed from the rescission action with an

action in the United States District Court in Fort Smith, Arkansas, not only for the value of the equipment but for loss of revenue which would have been received had the equipment been as represented, together with compensation for the time and effort expended in trying to make the ice manufacturing and vending equipment operable) had reached an agreement with Council in February, 1964, that if he would deliver the ice manufacturing and vending equipment to Council at Fort Smith at his expense, Council would refurbish it and bring it up to its 1964 standards and sell it on commission for approximately $100,000. Dr. Myers testified that he had advised the Bank's branch manager of this proposal and that the Bank had written Council and received a confirmation of such an agreement. The latter's performance under such an agreement was dependent on the delivery of the equipment to it at Fort Smith.

Dr. Myers also testified that, relying upon the advice of the Bank and its attorneys, and against the advice of his own attorney, he did not appeal from the judgment in the rescission action. He thereby thus lost the opportunity to establish his right to the statutory lien (RCW 63.04-.700(5)) given to buyers who have succeeded in a rescission action.

On May 13, 1964, Dr. Myers and the Bank's branch manager drove over 400 miles to visit the site of each piece of equipment and to get its serial number and an exact description of its location for the sheriff when the foreclosure was commenced. On that day, they located every piece of equipment but one, and that one they located the following day.

By May 21st the papers were all ready for commencement of the foreclosure, and on that date, for the first time, the Bank indicated that there was some question about its ability to proceed with the foreclosure, saying that the attorney for SACM had advised that the chattel mortgage had not been filed in the appropriate counties. Investigation disclosed that the Bank had failed to file the chattel mortgage in Yakima and Grant counties; consequently, the Bank did not attempt to foreclose the chattel mortgage.

The Bank did, however, promptly commence the present action on the note. Dr. Myers asked for and secured a jury trial. He urged, as a defense and counterclaim that he had failed to prosecute his appeal in the rescission action because of the promise of the Bank to foreclose its chattel mortgage; and that had the Bank foreclosed the mortgage, enough would have been realized from the sale of the mortgaged ice manufacturing and vending equipment to pay the note.[7]

The Bank urged that the defense was not tenable unless there was a valuable consideration for the Bank's promise to foreclose its chattel mortgage; and that there could be no consideration for that promise unless Dr. Myers gave up something of value when he gave up his appeal in the rescission case; hence, it must be established that the appeal would have been successful for it to have been of any value.

The trial court accepted this reasoning and felt that it was obligated to make a determination as to whether Dr. Myers' appeal in the rescission case would have been successful.

The crucial issue, had there been an appeal in the rescission action, would have been whether the trial court in that case was correct in holding that Dr. Myers had lost the lien on the equipment he had purchased from Modern—to which he was entitled under RCW 64.04.700(5) as a buyer who has been successful in a rescission suit.

The trial court in the action on the note, after reviewing the portions of the record in the rescission action[8] offered in evidence in the action on the note, concluded that the

---

[7] Dr. Myers urged, as a further defense, an accord and satisfaction or a compromise and settlement, which defense will be discussed later in this opinion.

[8] The record consisted of the 4-volume statement of facts in the rescission action (not certified by the trial court) and less than a quarter of the 109 exhibits offered in the rescission action, together with the pleadings, findings of fact, conclusions of law, and the judgment in that case. (There were, of course, no appellate briefs or argument on appeal). This only serves to point up the proposition that trial courts should not be called upon to perform the function of a multiple judge appellate court and decide the question of whether or not an appellant would have prevailed on an arguable appeal.

trial court in the rescission case was correct in holding that Dr. Myers had lost his lien and that the judgment in the rescission case would have been affirmed, or, in other words, Dr. Myers would not have succeeded on his appeal, so the right of appeal was of no value and, hence, there was no consideration for the Bank's promise to foreclose its chattel mortgage.

■ The Bank and the trial court, in the action on the note, have read too much into the opinion in *Sterios v. Southern Sur. Co.,* 122 Wash. 36, 209 Pac. 1107 (1922), which is cited in support of the proposition that for the surrender of the right of appeal to be a good consideration, it must be established that the appeal would have been successful. That is not the law. *Sterios* was an action for damages for failure to comply with an agreement to take an appeal, and held that the damages depended upon whether or not the appeal would have been successful. Assuming that the case was correctly decided, it is clearly distinguishable from the surrender of the right to appeal as a consideration for a promise, which is the issue now before us. *Sterios* distinguished its holding from *Globe Navigation Co. v. Maryland Cas. Co.,* 39 Wash. 299, 81 Pac. 826 (1905), which is more nearly comparable to the present case.

As to the claimed necessity of establishing that an abandoned appeal would have been successful, this court said in *Globe Navigation Co. v. Maryland Cas. Co., supra:*

> The respondent therefore had the absolute right to have the cause reviewed on appeal. It was induced to abandon that right by the conduct of appellant, and the latter should not now be heard to say that respondent was not prejudiced because of mere absence of a positive demonstration that it would have secured a reversal on appeal. No one except the Infinite Mind can determine that question to a certainty at this time. Not even the court that would have reviewed the case can now know whether in its view reversible error would have appeared or not. But the certain fact does appear that, by reason of appellant's conduct, respondent did not have the bene-

fit of the wisdom and experience of the learned judges of the appellate tribunal, the United States circuit court of appeals. (at 310)

"The certain fact does appear" that Dr. Myers did not have, to again quote the *Globe* opinion, "the benefit of the wisdom and experience of the learned judges of the appellate tribunal."

We are not saying that where an appeal would be patently frivolous that a trial court should not so hold— and in a proper situation say that the surrender of the right to a frivolous appeal was not a good consideration for a promise. However, we are saying that there need be no guaranty of the success of an appeal before the forbearance of the appeal can be a good consideration for a promise.

As we said in *Snyder v. Roberts,* 45 Wn.2d 865, 869, 278 P.2d 348, 351, 52 A.L.R.2d 631, 636 (1955):

It is well settled that the surrender of or forbearance from asserting a legal claim on which there exists a reasonable possibility of recovery is sufficient consideration for a promise. *Nicholson v. Neary,* 77 Wash. 294, 137 Pac. 492 (1914); *Sweeny v. Sweeny Inv. Co.,* 199 Wash. 135, 90 P.(2d) 716, 139 A.L.R. 847 (1939); *Opitz v. Hayden,* 17 Wn.(2d) 347, 135 P. (2d) 819 (1943); 1 Restatement, Contracts, 83, § 76.

As the Restatement puts it, there need only be an "honest and reasonable dispute."

The trial court in the action on the note was proceeding on the wrong theory when it sought to determine whether or not Dr. Myers' appeal would have been successful.

Our inquiry on the record before us satisfies us that an appeal in the rescission action would not have been frivolous.

The lien which was denied Dr. Myers by the judgment in the rescission case is authorized by RCW 63.04.700(5), which is as follows:

Where the buyer is entitled to rescind the sale and elects to do so, if the seller refuses to accept an offer of the buyer to return the goods, the buyer shall thereafter be deemed to hold the goods as bailee for the seller, but subject to a lien to secure the repayment of any portion

of the price which has been paid, and with the remedies for the enforcement of such lien allowed an unpaid seller by RCW 63.04.540.

We have no opinions construing this section, but other courts have held that it is a possessory lien, and that unless the buyer has possession he cannot enforce his lien. *Weaver v. Superior Court*, 93 Cal. App. 2d 729, 209 P.2d 830, *rehearing on other grounds*, 210 P.2d 246 (1949); *In re Tuduri's Estate*, 156 Misc. 317, 281 N.Y.S. 630 (1935).

The courts, however, have given no clear indication of what is meant by possession. Equipment of the kind involved in the rescission case was scattered in 22 different places and certainly physical possession was not practicable. The trial court, in the rescission action, placed emphasis on the fact that Dr. Myers had not operated the equipment after October, 1962, and had permitted Modern to operate it in the 1963 season. The operation in 1963 was actually by Vernon Stone, so that Modern and Council might have a better chance to make repairs that would make the equipment acceptable to Dr. Myers. The latter was personally interested and cooperative in the efforts being made in the summer of 1963 to satisfy him that the equipment would operate satisfactorily. Certainly, no one was claiming the equipment adversely to him, and the rescission action was still pending with the defendants urging that he ought to keep the property. It seems to us very definitely arguable that Dr. Myers lost none of his rights by consenting to a continuation of the rescission action, or by the anomalous operation that occurred during the 1963 season, and that the trial court in the rescission action may have erred in holding that Dr. Myers had lost his buyer's lien at the time of trial, October-November, 1963. Even as late as May, 1964, when Dr. Myers and the representative of the Bank checked the equipment prior to the contemplated foreclosure, it would seem that Dr. Myers could have taken possession of the property if the trial court had not made the determination that he had no lien.

We are making no decision as to whether he would have prevailed on his appeal; we are saying that an appeal in the

rescission action would not have been frivolous, and that it would have presented an honest and reasonable dispute.

The appeal being arguable and not frivolous, the giving up of the right of appeal by Dr. Myers was a definite detriment to him that constituted a good consideration for the Bank's promise to foreclose its chattel mortgage. The trial court, in the present action, erred in refusing to submit to the jury the counterclaim of Dr. Myers: That he had been damaged by the Bank's failure to keep its promise to foreclose the chattel mortgage.

We would be in entire accord with the Bank in its contention that the chattel mortgage was taken solely for its protection; that it was under no obligation to record it, or to foreclose it; and that it was entitled to do exactly what it did do—disregard the mortgage and sue on the note—had it not been for the Bank's promise to foreclose. A bank, too, has an obligation to keep its promises to those who deal with it when there is a consideration for such promises.

The Bank urges that there was no evidence of the value of the equipment, except that of Dr. Myers. It is true there were no expert opinions as to the value at the time when the Bank should have foreclosed. There was, however, evidence of a purchase price of some $72,000 and of the Bank's appraisal for loan purposes. The jury had also heard the testimony concerning the defects and failures of the equipment and the inability to remedy them. There was also the testimony concerning the agreement by Council to refurbish and sell the equipment for a very substantial sum, and also Dr. Myers' testimony that he refused to part with his judgment in the rescission action "to get this mess of equipment."

There was certainly evidence from which the jury could have arrived at a conclusion as to the value of the equipment and there would doubtless have been more had the trial court not indicated that it was not considering the counterclaim and was directing a verdict.

The counterclaim, labeled "first affirmative defense," should have been submitted to the jury with appropriate instructions.

As stated succinctly in Dr. Myers' brief, the second affirmative defense asserted that the Bank had agreed to accept the sum of $40,000 in full settlement of the action on the note and to assign to Dr. Myers all claims against SACM.[9] No written agreement was ever executed and the payment, though tendered, was never accepted.

The trial court granted a motion to strike this affirmative defense at the beginning of the trial because it failed to state a claim—there being no consideration for an agreement to accept the sum of $40,000 in full settlement of the more than $70,000 then due on the note.

The trial court cited, in support of its ruling, three Washington cases: *Berliner v. Greenberg*, 37 Wn.2d 308, 223 P.2d 598 (1950); *Joyner v. Seattle*, 144 Wash. 641, 258 Pac. 479 (1927); *Rogers v. Spokane*, 9 Wash. 168, 37 Pac. 300 (1894).

■ These cases support the proposition that there can be no accord and satisfaction without a new agreement supported by a new consideration; and an agreement to accept a stated amount in settlement of a larger claim is not such a new consideration until actual payment and acceptance of the stated amount. While a tender is alleged, there is no contention that the stated amount was ever accepted by the Bank. Since there was no acceptance of the tender, there was no new consideration, and the Bank was not bound by its agreement to settle. The trial court did not err in striking that defense.

A remand being necessary for a new trial on the counterclaim, our first inclination was not to pass on the crossappeal which raises only the issue of the adequacy of the attorney's fee allowed by the trial court, *i.e.*, $3,000.

[9] A considerably more detailed arrangement was alleged as an amendment to this defense at the time the trial court made its ruling. The amendment was allowed, with the trial court commenting that it made no difference in its ruling. This amendment is not discussed in the appellant's brief, and our consideration is limited to what was actually argued in the brief.

SACM had taken, at some time after May 13, 1964, when the evidence indicates that all the equipment was still on the various locations in Yakima and Grant counties, physical possession of the equipment and removed it to Seattle.

However, the judgment secured by the Bank on the note cannot be larger and may be less as a result of the remand, and it is apparent that the Bank is not entitled to recover any additional attorney's fee for litigating the issues remaining to be considered. It would seem that there is no reason why the issue as to the attorney's fee on the note should not be disposed of at this time.

The Bank urges that the note itself provides for an attorney's fee of 5 per cent of the amount then due, if placed in an attorney's hands for collection and the amount is paid before suit is commenced; and an attorney's fee of 10 per cent of the amount due if suit is commenced and the amount due is paid prior to judgment.

The note and all the parties recognize our long-established statutory rule (RCW 4.84.020) that after judgment attorney fees in such cases shall be fixed by the court in such sum as it shall deem reasonable, any stipulation in the note to the contrary notwithstanding.

Two distinguished members of the Yakima County Bar Association testified that a reasonable fee in this case would be $8,100 to $8,300. Each, however, started with a basic figure of 10 per cent of the amount due at the time the suit was commenced, or roughly $6,750, and then added two days and a half of trial time together with the time for preparation and research, and came up with the amounts indicated above.

The trial court rejected the 10 per cent of the amount due as a starting base, labeling it as "unconscionable" and a "penalty" in cases where the amount claimed was as large as in the present case. We agree. The trial court pointed out that under the Yakima County Bar Association's minimum fee schedule,[10] computed on the amount of the judgment, the fee would have been $2,046.31, and started with that as the basic figure.

---

[10]The Yakima Bar Association's minimum fee would only be 2 per cent on amounts over $10,000. Its schedule calls for 15 per cent on the first thousand; 10 per cent on the next four thousand; and 5 per cent on the next five thousand; or a total of $800 on the first ten thousand.

The trial court then allowed in excess of $950 for 2 days' trial time and work and research in preparing for trial.

▮ The actual time consumed in proving the execution of the note, the amount due, and that it had not been paid was minimal. The affirmative defense, whether termed "accord and satisfaction," or "compromise and settlement" was stricken at the beginning of the trial. The real time-consuming controversy hinged on the cross claim for damages sustained by reason of the Bank's failure to keep its promise to foreclose the chattel mortgage.

The trial court was concerned as to the extent the Bank was entitled to recover attorney's fees in its effort to avoid liability on the cross claim for its failure to foreclose the chattel mortgage. This could have been a separate action, in which attorney fees would not have been involved.

We think the trial court's concern was justified; *See Dowding v. Smithers,* 82 Ariz. 261, 311 P.2d 967 (1957). In view of the Bank's own responsibility for the time spent in this litigation, we agree that the $3,000 attorney fee allowed was not an abuse of the trial court's discretion.

In view of the situation wherein the matter being sent back to be retried is in itself a separate action—the judgment on the note, together with the attorney's fee, is affirmed on the appeal and the cross-appeal.

The cross claim will be remanded to be retried, and if any judgment is secured against the Bank in consequence thereof, the amount of such judgment shall be credited on the judgment in favor of the Bank, unless the judgment on the note shall have been sooner paid.

FINLEY, HAMILTON, and NEILL, JJ., and POYHONEN, J. Pro Tem., concur.