527 F.2d 653
 17 UCC Rep.Serv. 958
 MICHAEL--REGAN CO., INC., a California Corporation,
Plaintiff-Appellant,
v.
Martin LINDELL, a sole proprietor doing business under the
firm name of Lindell Enterprises, Defendant and
Third-Party Plaintiff-Appellee,
v.
DAHLKEY, INC., a Washington Corporation, Third-Party
Defendant-Appellee.
 No. 73--3152.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 6, 1975.
As Amended on Denial of Rehearing
Dec. 24, 1975.
 
 1
 David P. Bergland (argued) of Bergland, Martin & McLaughlin, Newport Beach, Cal., for plaintiff-appellant.
 
 
 2
 Charles C. Gordon (argued) of Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for defendant and third-party plaintiff-appellee.
 
 OPINION
 
 3
 Before TRASK and CHOY, Circuit Judges, and MURRAY,* District Judge.
 
 MURRAY, District Judge:
 
 4
 This is an action for breach of warranty relating to certain unfinished alder tabletops manufactured by Dahlkey, Inc. (incorporated and principal place of business in Washington) and sold and delivered in Michael-Regan (incorporated and principal place of business of California) by Martin Lindell (a resident of Washington). Jurisdiction arises under 28 U.S.C. § 1332.
 
 
 5
 Michael-Regan is in the business of manufacturing wood products and marketing unfinished furniture parts to retail outlets. In November, 1970, Michael-Regan contacted Lindell, concerning the manufacture of alder tabletops. Although Lindell was unable to produce the tabletops, it acted as a broker, engaging Dahlkey, Inc., to construct the tabletops. In February, 1971, pursuant to the rather general instructions of Michael-Regan, Dahlkey furnished sample tabletops which were 'sealed with a coating of sealer.'
 
 
 6
 On March 31, 1971, representatives of the three corporations met in Washington. At this conference Mr. Fink (from Michael-Regan) rejected the design of the February samples, as well as Dahlkey's suggestion that the tabletops be sealed, and provided other specifications. Fink requested that a new set of samples be made out in accordance with a sample he brought to the meeting, instructing that the tabletops would be manufactured as he directed.
 
 
 7
 Thereafter, in April, 1971, Dahlkey made further samples which were shipped to Michael-Regan. Michael-Regan, on receiving these samples, had opportunity to inspect and test them, and subsequently placed orders for large numbers of tabletops based on the April samples. In September, 1971, representatives of Michael-Regan, Lindell and Dahlkey again met in Washington, at which time Michael-Regan agreed to purchase approximately 3,000 tabletops per month for a six-month period. This agreement enabled Dahlkey to order stock, to manufacture tabletops, and provided Michael-Regan with responably prompt delivery of tabletops ordered. Michael-Regan ceased placing orders in December, 1971, but Dahlkey continued to manufacture tabletops through mid-January, 1972. In February, 1972, in accordance with Michael-Regan's request Dahlkey indicated that it had $4,333.26 of inventory and tabletops on hand. The goods had no salvage value.
 
 
 8
 The appellant maintains that in January, 1972, it began to receive complaints from its distributors of a severe warpage problem in the tabletops. Michael-Regan brought suit on the 'defective' tabletops in June, 1972.
 
 
 9
 Michael-Regan, the appellant, contends that the warping was caused by the rigid attachment of the apron and braces to the bottom side of the tabletops, design and construction of which were left to the defendants. The district court concluded that the tabletops were defective because of the failure to seal, a practice ordered by Michael-Regan. In addition, Mr. Fink, the president of Michael-Regan, was found 'not inexperienced' as to the propensity of wood to distort due to change in moisture content, and therefore the responsibility for the warped tabletops rested on the plaintiff. The tabletops were held to be produced in conformance with the plaintiff's specifications and the quality of workmanship was good.
 
 
 10
 The district court entered a judgment providing that the plaintiff Michael-Regan's complaint regarding the breach of warranty be dismissed with prejudice; that Michael-Regan pay Lindell $13,674 (plus interest at the rate of 12% per annum) on unpaid invoices forming the subject matter of a counterclaim; that Michael-Regan pay Lindell (who would in turn pay Dahlkey) $4,333.26, plus 6% per annum interest, representing tabletops inventory on hand at Dahlkey; and that Lindell recover $18,543.00 as reasonable attorney fees from Michael-Regan. Plaintiff appeals from the judgment in favor of Lindell and Dahlkey on the breach of warranty question, the award for the value ofDahlkey's tabletops inventory, and the award to Lindell of attorney fees and 12% interest rate on the unpaid invoices.
 
 
 11
 I. THE CONTRACT BETWEEN MICHAEL-REGAN AND LINDELL REQUIRES MICHAEL-REGAN TO PAY LEGAL FEES INCURRED BY LINDELL IN DEFENDING THE BREACH OF WARRANTY ACTION
 
 
 12
 Federal courts are required to apply state law in diversity actions with regard to the allowance or disallowance of attorney fees. Peacock & Peacock, Inc. v. Stuyvesant Insurance Co., 332 F.2d 499 (8th Cir. 1964); Hardware Dealers Mutual Fire Insurance Co. v. Smart, 293 F.2d 558 (10th Cir. 1961); Stokes v. Reeves, 245 F.2d 700, 702 (9th Cir. 1957). Because there is no specific statutory authorization for recovery of attorney fees in these circumstances, the measure and mode of attorney's compensation is to be decided by the agreement of the parties. R.C.W. § 4.84.010 and § 62A.1--102. The only reference to a contractual provision for attorney fees is found in the lower left hand corner of the face of the Lindell invoices, which states: 'In case of suit, buyer agrees to pay attorney's fees and interest.'
 
 
 13
 The appellant argues that California rather than Washington law ought to be applied to the question of attorney fees. Michael-Regan failed to raise the conflicts issue before the district court, and it will not be considered for the first time on appeal.[1] Siletz Trucking Co. v. Alaska International Trading Co., 467 F.2d 961, 964 (9th Cir. 1972); Pellerin Laundry Machinery Sales Co. v. Reed, 300 F.2d 305, 309--310 (8th Cir. 1962).
 
 
 14
 Michael-Regan maintains that the only reasonable construction of the invoice language is that attorney fees are to be granted in case of suit to collect amounts due on the invoices, but in no event is it rational to hold that the provision means the buyer is responsible for attorney fees in a breach of warranty action whether it wins or loses. The appellant maintains that attorney fees incurred by Lindell must be apportioned between the counterclaim for amounts due on unpaid invoices and the defense of the action for breach of warranty. As authority for this conclusion, the appellant cites National Bank of Washington v. Myers, 75 Wash.2d 287, 450 P.2d 477 (1969). Myers is a rather complicated case involving both an action by a bank to recover on a promissory note and a counterclaim by the defendant charging a breach of promise by the bank chich adversely affected the security for the loan. The lower court granted judgment for the bank on the note, dismissed the counterclaim, and awarded the bank attorney fees pursuant to a provision in the note for attorney fees if suit were necessary to collect on the note. The defendant appealed on the dismissal of the counterclaim and the bank appealed the award of attorney fees, charging that they were inadequate.
 
 
 15
 The appellate court found that the trial court erred in dismissing the counterclaim and ordered a new trial on that issue. The court also affirmed the award of attorney fees on the grounds that most of the effort and time consumed in litigation was not in proving the execution of the note, the amount due, and that it had not been paid. The real time-consuming controversy hinged on the counterclaim for damages 'sustained by reason of the Bank's failure to keep its promise to foreclose the chattel mortgage.' Id. 450 P.2d at 485. The appellate court clearly indicated that it was the 'Bank's own responsibility for the time spent in this litigation (Id. at 486),' and thus refused to grant a larger attorney fee award.
 
 
 16
 Thus, Myers may be distinguished from the case at bar in that the majority of attorney fees in Myers was attributed to the fault of the party seeking attorney fees. In the instant case, Lindell, the party requesting the attorney fees, in not responsible for precipitating the litigation. The finding of the district court that there was no breach of warranty is affirmed here, and hence Lindell should not have to pay for securing adequate representation to defend the charge.[2]
 
 
 17
 The appellees contend that Washington courts have frequently allowed recovery of attorney fees for services rendered in conjunction with a case involving a claim and counterclaim, citing as an example, Ranta v. German, 1 Wash.App. 104, 459 P.2d 961 (1969). In Ranta, the plaintiff brought suit on a promissory note; the defendants, although admitting the execution of the note, raised 'fraud in the inducement' as an affirmative defense and counterclaim. The trial court dismissed the counterclaim and entered judgment for the plaintiff on the note, together with $1,000 reasonable attorney fees. Although there is no discussion of apportionment of fees between the claim and counterclaim, the admission of the defendants of the note is an indication that most of the time and effort spent on the case related to the counterclaim of fraud. Yet on appeal, the decision of the lower court was affirmed, including the award of attorney fees, the appellate court reasoning:
 
 
 18
 In cases where a note contains contractual provisions for a reasonable attorney's fee, if it is necessary to collect the note, the party suing thereon would be entitled to reasonable attorney's fees on the appeal as well as in the trial court. . . . 'Such a fee is as much a part of the obligation of the contract as any other part.' Id., at 964.
 
 
 19
 Thus Ranta supports the award of attorney fees in the case at bar.
 
 
 20
 Another recent Washington case, Commercial Credit Corp. v. Wollgast, 11 Wash.App. 117, 521 P.2d 1191 (1974), supports the award of attorney fees for both the claim and the counterclaim against Michael-Regan. In Wollgast, the financing creditor brought a suit against a snowmobile dealer to recover a deficiency between the amount of debt and the amount received on the sale of the repossessed machines. The defendant put forth a vigorous defense which included a counterclaim based on the plaintiff's failure to give the defendant proper notice of the sale. The trial court awarded the plaintiff a deficiency judgment of $1,335.50 and in addition allowed the plaintiff $1,225 in attorney fees pursuant to an agreement in which the defendant had agreed to reimburse the plaintiff for all expenses "including attorney's reasonable fees, incurred . . . in the enforcement or attempted enforcement . . .' of the agreement.' The appellate court cited the reasoning of the trial court in granting such large attorney fees:
 
 
 21
 If we were talking about a default matter that is one thing and I would severely limit the amount of fees that would be awarded on a default to some relatively small percentage, but we are not talking about that, we are talking about a case . . . where . . . a legal aid officer working essentially on a government payroll has decided to make an issue out of this and make the creditor scratch every inch of the way to the end that here is the time that we have. Id., at 1197.
 
 
 22
 The appellate court affirmed the above rationale and relied on it in granting an additional $500 for attorney fees expended in the appeal of the case.
 
 
 23
 Michael-Regan issued a debit memo to Lindell as a setoff on its claim for breach of warranty. Michael-Regan maintains that the amounts due on the unpaid invoices were stipulated and were never in issue, and it would therefore be inappropriate to award attorney fees attributed to the collection of the unpaid invoices as provided for by the invoice agreements. The appellant fails to acknowledge that there was a condition imposed on the tender of the amount due under the invoices, and that was that Lindell successfully defend Michael-Regan's action for breach of warranty. Because the tender of the amount due on the invoices was conditional, it would not foreclose the allowance of attorney fees. See, e.g. American Sheet Metal Works, Inc. v. Haynes, 67 Wash.2d 153, 407 F.2d 429, 433 (1965), and Kirk v. Allemann, 2 Wash.App. 183, 467 P.2d 319 (1970).
 
 
 24
 This conclusion with regard to the appellant's liability for attorney fees based on the discussion of Michael-Regan's admission of amounts due on unpaid invoices and the Wollgast case are further supported by a Ninth Circuit case, Jaeger v. Canadian Bank of Commerce (California), 327 F.2d 743 (9th Cir. 1964). In Jaeger, the court allowed recovery of attorney fees involved in both the collection on a note and the successful defense of a counterclaim, stating:
 
 
 25
 Plaintiff relies on Taylor v. Continental Supply Co., 16 F.2d 578 (8th Cir. 1926), as authority supporting the District Court's award. There, the Eighth Circuit observed that a provision for attorney's fees in a note covered the holder's costs of defending against a counterclaim, a statement with which we fully agree, as a general rule. For in that case, as in all such cases coming to our attention, the counterclaim was directly asserted against the note by way of offset in an attempt by the maker to reduce or extinguish his debt. . . . Clearly such services were within contemplation of the parties, because '(t)o collect the notes it was necessary to bring suit and to defend against the counterclaim.' Id. at 745--46.
 
 
 26
 Thus on the basis of the rationale presented in Jaeger and the law of the State of Washington, the appellee is entitled to a reasonable attorney fee in successfully defending this appeal. Granite Equipment Leasing Corp. v. Hutton, 84 Wash.2d 320, 525 P.2d 223 (1974); Puget Sound Mutual Savings Bank v. Lillions, 50 Wash.2d 799, 314 P.2d 935 (1957); Ranta v. German, 1 Wash.App. 104, 459 P.2d 961 (1969).
 
 
 27
 II. THERE IS NO CONTRACT BETWEEN MICHAEL-REGAN AND LINDELL REQUIRING THE PAYMENT BY MICHAEL-REGAN OF 12% PER ANNUM INTEREST ON UNPAID INVOICES
 
 
 28
 The appellant challenges the trial court's award to Lindell of 12% per annum interest on the unpaid invoices on two grounds: (1) there was no agreement requiring Michael-Regan to make such payments, and (2) application of such percentage would render the invoice contract usurious under California law. In diversity cases, state law governs the award of interest. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Hunt Foods v. Phillips, 248 F.2d 23, 26 (9th Cir. 1957); 28 U.S.C. § 1961.
 
 
 29
 Michael-Regan did not raise either of the above contentions in the trial court. Errors not raised below will ordinarily not be considered on appeal. Terkildsen v. Waters, 481 F.2d 201 (2d Cir. 1973); Babb v. Schmidt,496 F.2d 957 (9th Cir. 1974); Roberson v. U.S., 382 F.2d 714 (9th Cir. 1967). The appellant maintains that its arguments may be heard because under the provisions of Fed.R.Civ.P. 52(b), the sufficiency of the evidence to support the district court's finding may be raised.
 
 
 30
 In connection with Michael-Regan's first argument on the issue of interest, it points out two provisions on the invoice contract. The first is in the lower left hand corner of the face of the invoice and reads: 'In case of suit buyer agrees to pay attorney fees and interest.' The second reference, found on the reverse side of the invoice states: '4. Seller may add handling charge of 1% per month on unpaid past due amounts.' (Emphasis added.) The appellant concludes 'that no evidence whatever was presented that the Seller had in fact added such a handling charge or that the rate of the handling charge was intended to be the interest rate in the event of suit.'
 
 
 31
 Appellant's reliance on Rule 52(b) is justified even though not asserted below, for it is clear that interest at 12% was not contracted for, so the sufficiency of evidence is raised. The finding should be set aside and judgment amended to reflect the legal rate in Washington.
 
 
 32
 III. MICHAEL-REGAN IS OBLIGATED TO MAKE PAYMENT TO LINDELL FOR THE VALUE OF DAHLKEY'S TABLETOP INVENTORY
 
 
 33
 Michael-Regan maintains that it should not have been held liable for Dahlkey's tabletop inventory because, first, Lindell was unauthorized to allow Dehlkey to build up such inventory, and second, any oral contract upon which Dahlkey may have relied would be in violation of the Statute of Frauds. Again, as pointed out by appellees, neither of these contentions was presented to the trial court, and need not be heard by this court now. Michael-Regan disputes this, arguing that Fed.R.Civ.P. 52(b) applies and there was insufficient evidence for the trial court to conclude that Michael-Regan is liable for the inventory in question.
 
 
 34
 With regard to Michael-Regan's first contention, neither side disputes the existence of an oral contract taking place in September, 1971, whereby Michael-Regan agreed to purchase approximately 3,000 tabletops per month for a six-month period. The parties do disagree, however, as to whether the September agreement contemplated an accumulation of tabletop inventory by Dahlkey without a specific order to that effect from Michael-Regan. The district court held the plaintiff liable for the inventory, finding that the September agreement 'would permit Dahlkey to order stock, to manufacture tabletops, and give Michael-Regan reasonably prompt delivery of tabletops ordered.'
 
 
 35
 Appellees are entitled to have the evidence viewed in a light most favorable to them, Smith v. James Irvine Foundation, 402 F.2d 772, 774 (9th Cir. 1968). There is evidence in the transcript to support the trial court's finding. Plaintiff's reliance on Rule 52(b) to assert the argument that Michael-Regan did not authorize Dahlkey's accumulation of inventory is not well founded.
 
 
 36
 Appellant's contention relating to the statute of frauds cannot be asserted for the first time on appeal. Rule 8(c) of the Fed.R.Civ.P. lists 'statute of frauds' as an affirmative defense which should be pleaded. 'Failure to do so operates as a waiver of such defense under Rule 12 . . ..' Wineberg v. Park, 321 F.2d 214, 218 (9th Cir. 1963).
 
 
 37
 IV. THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE FINDING WHICH EXCLUDES THE IMPLIED BREACH OF WARRANTY ON THE SALE OF THE TABLETOPS
 
 
 38
 Michael-Regan's assertion that the tabletops, forming the subject matter of this suit, were unmerchantable is undoubtedly true. However, appellant's contention that the facts do not support a finding that the implied warranty of merchantability was excluded, is incorrect. The trial court's findings cannot be set aside on appeal unless they are 'clearly erroneous.' Purer & Co. v. Aktiebolaget Addo, 410 F.2d 871, 878 (9th Cir. 1969); Fed.R.Civ.P. 52(a).
 
 
 39
 Under the Uniform Commercial Code, an implied warranty of merchantability arises in a sales contract when the seller is a merchant with respect to goods of that kind (R.C.W. 62A.2--314). There is at least one method, relevant to the facts of this case, whereby the warranty of merchantability can be excluded, as indicated by R.C.W. 62A.2--316(3)(b):
 
 
 40
 When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him;
 
 
 41
 This provision supports the district court's conclusion that Michael-Regan received no warranty of merchantability on the tabletops. The court found that Michael-Regan had an opportunity to inspect, test, and examine the same tabletops furnished by Dahlkey in April, 1971, and that Michael-Regan ordered large quantities of the tabletops on the basis of those samples.
 
 
 42
 Michael-Regan does not contest its opportunity to inspect the samples, nor does it deny the conformity of the tabletops delivered under the contract to these April samples. Its primary objection to the application of § 316(3)(b) was a charge, that the defect in this case was 'latent,' and consequently there was insufficient evidence to support a finding that the implied warranty of merchantability was waived by inspection. Official comment 8 to § 316 clarifies the basis of the appellant's argument and further buttresses the finding of the court.
 
 
 43
 The particular buyer's skill and normal method of examining goods in the circumstances determine what defects are excluded by the examination. A failure to notice defects which are obvious cannot excuse the buyer. However, an examination under circumstances which do not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing. Nor can latent defects be excluded by a simple examination. A professional buyer examining a product in his field will be held to have assumed the risks as to all defects which a professional in the field ought to observe . . . (Emphasis added.)
 
 
 44
 See also, Richards Manufacturing Co. v. Gamel, 5 Wash.App. 549, 489 P.2d 366 (1971). The evidence supports the district court's finding that Mr. Fink, as president of Michael-Regan, was far from inexperienced in the wood industry. As such he knew or should have known that wood has a tendency to warp because of change in moisture content and that sealing the wood was the proper method to treat such distortion. The court's conclusion as to the cause of the defect is also supported by the evidence.
 
 
 45
 The appellant argues that the defect was latent because none of the parties thought the goods to be defective when sold. The appellant, however, has not established that it was not aware of the circumstances which caused the defect (the propensity of wood to distort and the ability of sealing to solve the problem). Moreover, Comment 8 makes it clear that even actual failure of knowledge is no excuse where a professional in a field should have been aware of defects.
 
 
 46
 Thus the district court's conclusion that the implied warranty of merchantability never arose in these circumstances is fully justified.
 
 
 47
 This case is remanded to the district court to fix interest and attorney fees, including attorney fees on appeal, in accordance with the law of Washington. In all other respects the case is affirmed.
 
 
 48
 The Petition For Rehearing is denied.
 
 
 
 *
 Honorable W. D. Murray, Senior United States District Judge, District of Montana, sitting by designation
 
 
 [1]
 In the judgment of this court, however, even under California law, the appellant is liable for attorney fees. The appellant relies heavily on Ecco-Phoenix Electric Corp. v. Howard J. White, Inc., 1 Cal.3d 266, 272; 81 Cal.Rptr. 849, 461 P.2d 33 (1969), to support its contention that it is liable only for legal fees attributable to the counterclaim (to collect amounts due on invoices) and not those related to defending the breach of warranty action. In Ecco-Phoenix, the California Supreme Court was called upon to interpret a contractual clause providing that the 'Subcontractor' was to bear all costs and attorney fees '(s)hould litigation be necessary to enforce any term or provision of this agreement.' The court there determined that the subcontractor, who had been awarded judgment, was not liable for attorney fees. The court held that for the contract provision to apply: (1) the litigation for which the party relying on the contract provision recovers attorney fees must be bona fide and (2) such litigation must have been made necessary by the party who opposes payment of those fees. Id., 81 Cal.Rptr. at 852, 461 P.2d at 36; (See also Fabares v. Benjamin, 180 Cal.App.2d 264, 4 Cal.Rptr. 359 (1960), where the court refused to require the prevailing party on the breach of contract issue to pay attorney fees incurred by the party losing on that issue.) In the case at bar, the Ecco-Phoenix criteria are satisfied. First, the litigation for which Lindell seeks recovery of attorney fees was the defense to Michael-Regan's action for breach of warranty. The defense was clearly bona fide. Secondly, the litigation was made necessary by Michael-Regan, the party contesting the contract provision. The plaintiff not only initiated the litigation but failed to prove its claim
 This interpretation of Ecco-Phoenix is supported by two subsequent California decisions, Hunt v. Smyth, 25 Cal.App.3d 807, 823--33, 101 Cal.Rptr. 4, 21 (1972) and Nevin v. Salk, 45 Cal.App.3d 331, 119 Cal.Rptr. 370 (1975). The Hunt case is analogous to the instant case in that the defendant and prevailing party was awarded attorney fees on the basis of a contract provision which the plaintiff claimed was not intended to cover the type of litigation which developed. The court rejected the plaintiff's argument, saying: '(t)he purpose of upholding an attorney's fees provision in a promissory note is to allow a plaintiff to recover the full amount due him without such amount being diminished by attorney's fees.' Although apportionment was not argued on appeal in Nevin, the court held as 'proper and reasonable,' legal fees which were not apportioned. Nevin involved a suit on a contract (incorporating a note and deed of trust) which required the purchaser to pay attorney fees and an action for fraud in connection with the sale.
 In the light of the decisions previously cited, Shannon v. Northern Counties Title Insurance Co., 270 Cal.App.2d 686, 76 Cal.Rptr. 7 (1969) does not convince this court to apportion attorney fees. The appellate court in Shannon found a lower court award of attorney fees adequate, stating:
 Under such circumstances it would appear neither unreasonable nor an abuse of the wide discretion of the trial court for it to make an allocation of attorney fees attributable to the actual collection of the $1,500 note, as distinguished from those attorney fees more properly attributable to defense against a possible adverse $50,000 judgment.
 Id., 76 Cal.Rptr. at 10.
 Although Shannon appears to lend support to appellant's position, it is interesting to note that Hunt and Nevin were decided subsequent to Shannon. The decisions can be reconciled by concluding that apportionment of attorney fees in these circumstances is largely a discretionary matter with the trial court.
 
 
 [2]
 This approach is supported by decisions in other jurisdictions. Cf. 41 A.L.R.2d 677 (1955)